**Charles SHERMAN, and Gail Ann Sherman, his wife, Plaintiffs,**

**v.**

**OPTICAL IMAGING SYSTEMS, INC., (formerly Ovonic Imaging Systems, Inc.), and Energy Conversion Devices, Inc., Defendants.**

**No. 93–71649.**

United States District Court, E.D. Michigan, S.D.

Feb. 15, 1994.

John M. Callahan, Southfield, MI, for plaintiffs.

Gregory V. Murray, Detroit, MI, for defendants.

## OPINION AND ORDER

ROSEN, District Judge.

### I. INTRODUCTION

This case involves the alleged constructive discharge of Plaintiff Charles Sherman ("Sherman") from Defendant Optical Imaging Systems ("OIS") in October, 1992. Plaintiffs filed a six-count complaint against OIS on March 19, 1993. Count I alleges a violation of the Michigan Handicappers' Civil Rights Act ("MHCRA").[1] Count II alleges a

---

1. After reviewing Plaintiffs' complaint and brief in response to Defendant's summary judgment motion, the Court views Plaintiffs' claim under the Michigan Handicappers Act to hinge on the following sections:

An employer shall not:

\* \* \* \* \* \*

(b) Discharge ... an individual ... because of a handicap that is unrelated to the individual's

violation of the federal Americans with Disabilities Act ("ADA").[2] Count III alleges a negligence cause of action. Count IV alleges a claim for wrongful discharge. Count V alleges a violation of the federal Age Discrimination in Employment Act ("ADEA").[3] Count VI alleges a claim for constructive termination.[4] Lastly, Plaintiff Gail Ann Sherman seeks damages for a loss of consortium as a result of Sherman's alleged discharge.

This case was timely removed to federal court on April 20, 1993. On August 10, 1993, the parties stipulated to the dismissal, with prejudice, of Plaintiffs' claims against Defendant Energy Conversion Devices. On November 30, 1993, Defendant OIS filed a motion for summary judgment on all Plaintiffs' counts. Plaintiffs responded on January 18, 1994, and OIS replied on January 28. Having reviewed the record and the parties' briefs, and having heard oral argument on February 3, 1994, the Court is now prepared to rule on OIS' motion. This Memorandum Opinion and Order sets forth that ruling.

## II. *FACTUAL BACKGROUND*

OIS is a Delaware corporation with its principal place of business in Troy, Michigan. OIS currently develops and manufactures flat panel liquid crystal displays. These displays are used by the Department of Defense and the Federal Aviation Administration for such things as digital maps and forward-looking infrared radar.

On January 30, 1987, OIS hired Sherman as an industrial designer. At the time of his hiring, Sherman informed OIS that he was diagnosed with dyslexia.

Initially, Sherman was working on commercial scanners. However, as OIS switched production to the flat panel liquid crystal displays for government clients, its in-house demands for industrial designers declined. Rather than terminate Sherman or offer him a job at a lower salary, OIS transferred him to a mechanical engineer position.

On April 16, 1992, Sherman and his immediate supervisor, Tim Ewald, met to discuss Sherman's job responsibilities and goals for the period of March 20–June 30, 1992. A memorandum of that meeting signed by both Sherman and Ewald stated that Sherman's general responsibilities were "[t]o design all elements of OIS backlights including coordination of changes in backlight properties with other OIS departments." OIS' Brief, Exhibit D. More specifically, Sherman was placed in charge of five projects with various deadlines set for dates on or before June 30, 1992. They consisted of the following: (1) reducing the costs of backlights; (2) working on SFIM modules; (3) working on lamp heater designs; (4) making progress on a molded image splitting diffuser; and (5) building various demonstration items. *Id.* Sherman and Ewald set the deadlines in the memorandum based on Sherman's estimates of the time it would take to complete each project. Sherman's Deposition, pp. 102–03 (found in OIS' Brief, Exhibit A).

On June 15, 1992, Ewald met with Sherman to check his progress on the five projects. Ewald filled out a written evaluation, signed by both him and Sherman, which stated that Sherman was making "satisfactory" progress on Project (5), that his work on Project (2) "needed improvement," and that his work on the three other projects was "unacceptable." At least the first four pro-

---

ability to perform the duties of a particular job or position.

 * * * * * *

(g) Discharge ... an individual when adaptive devices or aids may be utilized thereby enabling that individual to perform the specific requirements of the job.
M.C.L. §§ 37.1202(1)(b), (g).

**2.** This Act provides, *inter alia,* that:
No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees....

42 U.S.C. § 12112(a).

**3.** This Act states, *inter alia:* "It shall be unlawful for an employer— ... to discharge any individual ... because of such individual's age...." 29 U.S.C. § 623(a)(1).

**4.** The Court does not read this sixth count as a separate cause of action; rather, it appears Plaintiff's constructive discharge claim merely sets out Plaintiff's spin on the factual context of his termination.

jects were listed as of "important" significance to the company. The fifth project—the only one that Sherman was completing satisfactorily—did not receive a ranking on OIS' three-step significance level. *See* OIS' Brief, Exhibit E (evaluation sheet which, *inter alia*, ranks projects by the grades "essential," "important," or "routine").

In a commentary written at the bottom of Sherman's June 15, 1992 evaluation, Ewald wrote the following: "Chuck has been distracted from his primary goals. Chuck needs to pay particular attention to accurate estimating and completion of tasks. An interim review is scheduled for 9/15/92." *Id.* Finally, the evaluation set a goal for Sherman to "complete *all* task[s]" by the September 15 review. *Id.*

Ewald next reviewed Sherman's work on October 20, 1992. In a memorandum made on that same date, Ewald wrote:

The following summarizes the interim performance review held today with Chuck Sherman.

I began by explaining the type of business that the company has been pursuing has changed since Chuck was hired. I explained that we are no longer developing commercial scanners and other products that require industrial design and graphic artist services. I then told Chuck that I thought very highly of his skills as an industrial designer and graphic artist, but that his performance as a backlight mechanical engineer has not shown enough progress since our last review in June. I reminded him that the lamination problems [Project (4) above] and the lamp heater application problem [Project (3) above] are still in the same state as the day that I joined the company in February [1992] despite many man months devoted to studying the problems.

Chuck responded by acknowledging that the problems still exist and asked whether I was aware of all of the problems with backlight designs. I responded that I was aware of many problems, but that I could not be sure I knew of them all.

At this point, Chuck wanted to discuss whether or not OIS is pursuing the backlight business. We talked about the fact that many of our customers see the possibility of OIS providing a backlight as a threat. I reiterated that I felt that Chuck was incapable of solving the backlight problems that we face in a time frame that we could afford. I suggested that maybe his inability to solve these problems over the last 8 months may be related to his lack of a college education or to the dyslexia that he often points out. I also asked Chuck if there was anything that OIS could to do accommodate his dyslexia.

Chuck acknowledged that he was not able to perform thermal analysis on the backlights, and that there was nothing that the company could provide to accommodate his dyslexia. We both agreed that backlight design provides many technical challenges. Chuck took the position again that there was nothing he could do to speed up his "invention" process. I re-emphasized that the backlight problems we are facing would be better solved by a formal analytic engineering approach, rather than waiting another 8 months for an "invention" to happen.

I asked Chuck if he had any suggestions on how I could help him get results. He suggested that I have not provided the same level of attention and coaching to him as I have to the other three mechanical engineers. I assured him that that was not the case and reminded him of the meetings that I have had with him on the subject of backlight problems. He claimed he was not able to schedule lab time to conform to his ideas.

I reminded him that when he brought this to my attention at our last review that I instructed him to bring this to my attention immediately when it happened, and I would assist in resolving the conflict. The first and only time that Chuck has brought this to my attention, other than during a poor review, was last Friday. Chuck also accused OIS of not communicating to him all of the relevant information to backlight designs. I explained that I regarded Chuck's communication skills a contributing factor to his lack of results on the backlight projects.

In closing, I re-emphasized that I felt Chuck was an excellent performer when it came to industrial design and graphic arts, but that I felt he was not capable of dealing with the complexities of backlight designs in a time frame OIS could afford. I suggested that Chuck should consider looking for work as an industrial designer at another company and that OIS would consider a severance offer that would allow him time to look for another job. Chuck is going to consider everything we talked about and meet with me later this week.

OIS' Brief, Exhibit F.

Sherman signed this report on October 21, 1992, but wrote that he "d[id] not necessarily agree." *Id.* According to Sherman, the reason he was unable to complete the projects Ewald gave him was because he was also receiving assignments from other supervisors at OIS. Sherman Deposition, p. 89. However, Sherman admitted that "[t]hese were small jobs." *Id.* Moreover, Ewald explained how he permitted his employees to perform extra-department work so long as they continued to complete projects he assigned:

Q. Did you ever discuss with any other department heads verbally or in writing or posting that they shouldn't come in and ask your people to do it or that if they wanted something done, they should come right to you and not to any individual?

A. Yes.

Q. Were those instructions followed or did people still go to individuals, primarily Chuck?

A. Some department managers followed it more regularly than others.

Q. So even though you had requested that they not go to people other than you, still some department managers or their employees still went to Chuck?

A. Yes. I didn't want it to become a bottleneck for work in the company. As a manager, I instructed our people that if they wanted to approach anyone in my department, they were welcome to do so and let that individual decide whether they had the time to meet the deadlines I had given them. I did not want to instruct people to get a hold of me first. If they had time available to loan to someone or perform some work for other departments, I instructed them to do that.

Plaintiffs' Response Brief, Exhibit B, p. 60.

At the close of the October 20, 1992 meeting, Ewald suggested three alternatives to Sherman: (1) he could resign with a severance package; (2) he could remain on the job and bring his performance up to a satisfactory level; or (3) he could face discharge for just cause. *See* Plaintiffs' Response Brief, Exhibit F (October 26, 1992 memorandum regarding telephone conversation that same day between Sherman and Ewald). Sherman's last day of work was October 26, 1992. On that day he came to the office early and told co-employees he had been laid off; he then cleaned out his desk. Ewald called him at home later that day. In that telephone conversation, Ewald told Sherman that he was not laid off, but, rather, should consider the options he had been given. According to Ewald's memorandum on the call, Sherman agreed to come back to work to discuss the matter further, but never did. *Id.*

Sherman states that the reason he never returned to work at OIS was that he had heard from a co-employee, Paul Voisin, that the top two managers of the company had a conversation in which they stated that the decision to discharge Sherman had already been made. Sherman recounted what he knew about the alleged conversation in his deposition:

Q. What was it specifically that Mr. Voisin told you that—

A. That he had overheard Fan Luo and Chuck Wilson talking about it, about my dismissal, and they were laughing. And one was patting the other—I'm not sure which one patted the other on the back, but they were laughing and saying they had made a good decision.

Q. Do you know when this alleged conversation took place?

A. It was probably within that day or day before the day I was terminated. And they were laughing about it. So I knew right then I had no chance of staying with the company. And that's why,

when Tim [Ewald] asked me would I need any help, I felt it was of little to no value.

Sherman Deposition, pp. 72–73. According to Sherman's testimony, he apparently learned of the Luo–Wilson conversation before the October 20 meeting in which Ewald gave Sherman his options. *See* Sherman's Deposition, pp. 69–74.

Focusing for the moment on Plaintiffs' state and federal disability discrimination claims, Sherman's deposition reveals that he did not consider his dyslexia to be a problem at work:

Q. Now, it is my understanding that you are claiming in this case that you are handicapped because you are dyslexic.

A. That's right.

Q. How did that affect what you did on the job?

A. *I don't know that it had that large a role to play. I don't think it was affecting me to a large degree.*

Q. Did it slow you down any?

A. It may have in some areas, yes. In an area where I was expected to read a particular document, yes, that would slow me down.

Q. Would you, in estimating your time, build in extra time for yourself if reading was required?

A. *Rarely was there reading. In fact, never was there reading required; not required.*

Q. *Reading was never required in your job assignments from Mr. Ewald?*

A. *No.*

Q. Is it fair to say that to the extent your dyslexia may have affected the speed with which you did a job, that that delay would have been built into your estimate because it was a delay that was part of your experience that went into estimating?

A. (Shaking head from side to side) MR. CUTLER: I think this has been asked and answered, counsel.

BY MR. MURRAY, CONTINUING:

Q. Your shaking your head no.

A. No.

Q. Because you're saying dyslexia didn't delay—

A. No.

Q. That's not what you're saying?

A. *I'm saying that the fact that I have dyslexia did not hamper or deter or come into that period of time. It didn't enter into the timing.*

Sherman Deposition, pp. 58–59 (emphasis added).

Moreover, Sherman essentially conceded at his deposition that no one at OIS discriminated against him on the basis of his dyslexia:

Q. Do you remember Mr. Ewald saying anything about your dyslexia?

A. No.

\* \* \* \* \* \*

Q. Did you ask anybody at ... OIS for special help because of your dyslexia?

A. No.

Q. Is that a no?

A. *No. To my knowledge, there was no problem with that.*

\* \* \* \* \* \*

Q. Mr. Sherman, you have alleged that OIS discriminated against you, correct? . . .

A. Yes.

Q. Is there a particular individual at OIS that you believe is the one who discriminated against you?

A. Well, Tim [Ewald] was my supervisor, so I'm going to have to say if anybody did, it would be just my supervisor. There was no contact to me by anyone else.

\* \* \* \* \* \*

Q. Are you alleging that anything was done to you while you worked at ... OIS because you were dyslexic?

A. No.

Q. What facts do you have on which you base your opinion that the reason for your termination was dyslexia?

A. Tim's description would indicate that. If you look at it, you will see. \* \* \*

These two paragraphs are the ones I am referring to. It mentions dyslexia here and there, so I'm imagining that's what it was.

\* \* \* \* \* \*

Q. *What did you tell Mr. Ewald when he asked you whether there was anything OIS could do to accommodate your dyslexia?*

A. *My words were there is nothing that they could do.*

Q. Is it fair to say because even at that time, you thought dyslexia wasn't a problem and, therefore, you didn't need them to do anything?

MR. CUTLER: I think that's contrary to the evidence you have heard. It assumes facts not in evidence. He said, in fact, he already knew he was being fired, so why would he ask them to do something for him in the future.

THE WITNESS: That's the way I looked at it. I felt there was nothing that was going to change anything. So my answer was, no, there was nothing I felt they could do....

\* \* \* \* \* \*

Q. Did any of your co-workers at ... OIS treat you in any way that [led] you to believe that any of them were discriminating against you because of your dyslexia?

A. No.

MR. CUTLER: That excludes Mr. Ewald?

MR. MURRAY: That excludes Mr. Ewald.

THE WITNESS: No.

\* \* \* \* \* \*

Q. Were you subject to any written or verbal test while you were employed by ... OIS?

A. No.

Q. No testing?

A. No testing.

Sherman Deposition, pp. 62, 65–67, 74, 79, 80 (emphasis added).

Similarly, Sherman also vitiated any claim of age discrimination with the following testimony:

Q. You also allege, Mr. Sherman, that you were discriminated against because of your age; is that correct?

A. I thought it might have a bearing on it as a result of the fact I am now 50 years old.

Q. Other than the fact that your employment ended at OIS, do you have any other facts that would lead you to the conclusion that your age made a difference in how you were treated by Mr. Ewald or anyone at ... OIS?

A. I am not sure I understand that question.

Q. *Do you believe that people treated you differently at the company because of your age?*

A. *No.*

Q. *Do you believe Mr. Ewald thought less of you because of your age?*

A. *No.*

Q. Do you believe that Mr. Ewald or anyone at OIS made your job more difficult because of your age?

A. I don't know what the reasons were for seemingly having a more difficult time toward the latter months with Tim. I don't know. There were several things that could have caused it, age being one. I don't know.

Q. *Did Mr. Ewald or anyone from OIS ... ever say anything to you about your age?*

A. *No.*

Q. Were there any teasing, jokes, or unkind remarks made to you because of your age or about your age?

A. No.

Sherman Deposition, pp. 81–82 (emphasis added).

With respect to Plaintiffs' breach of implied contract claim, the only statement on which Plaintiffs rely to rebut the presumption of at-will employment is the one made to Sherman in his October 20, 1992 review with Ewald; namely, that he could keep his job if his performance improved. *See* Plaintiffs'

Brief, p. 24. It is uncontested that OIS did not make any other oral or written statements that may have led Sherman to believe that he was a just-cause employee.

Finally, it is also undisputed that Sherman failed to file charges of age or disability discrimination with the Equal Employment Opportunity Commission at any time after his allegedly discriminatory constructive discharge—even after OIS identified the fact that Plaintiffs did not "satisfy the procedural prerequisites to suit" as one of its affirmative defenses. *See* OIS' Answer, p. 11 (filed April 26, 1993).

## III. ANALYSIS

### A. THE STANDARDS GOVERNING CONSIDERATION OF A MOTION FOR SUMMARY JUDGMENT.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court decisions— *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[5] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment:

[*] Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

[*] The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

[*] This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. * * *

[*] The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

[*] The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

[*] The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (footnotes with citations omitted). The Court will apply the above principles in deciding OIS' motion for summary judgment.

---

**5.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright et al., *Federal Practice & Procedure*, § 2727, at 33 (Supp.1993).

## B. *PLAINTIFFS' MHCRA CLAIM MUST BE DISMISSED.*

In order to prevail on a MHCRA claim, Plaintiffs must first establish a *prima facie* case of handicap discrimination. OIS will then have an opportunity to rebut the *prima facie* case by showing a legitimate, non-discriminatory reason for ·Sherman's termination. Lastly, Plaintiffs will have a chance to demonstrate that OIS' proffered reason is merely a pretext for discrimination. *See Crittenden v. Chrysler Corp.*, 178 Mich.App. 324, 443 N.W.2d 412, 415 (1989).

 Under MHCRA, a *prima facie* showing of a handicap-related discriminatory discharge is made when a plaintiff demonstrates the following: (1) he is handicapped; (2) his handicap is unrelated to his ability to perform his job; (3) he was discharged; and (4) there is some evidence that the employer acted with discriminatory intent. *See Dubey v. Stroh Brewery Co.*, 185 Mich.App. 561, 462 N.W.2d 758, 759 (1990), *ap. denied*, 437 Mich. 916 (1991) (holding that a showing of discriminatory intent is necessary to make out a *prima facie* case of age discrimination); *Crittenden*, 443 N.W.2d at 415.

In the instant case, the Court holds that Plaintiffs cannot make out a *prima facie* case. For one thing, Plaintiffs have not presented any evidence that Sherman is handicapped.

MHCRA defines "handicap" as follows:

A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or function disorder, if the characteristic ... substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position....

M.C.L. § 37.1103(e)(i)(A). The statute further states that: "['unrelated to the individual's ability'] means, *with or without accommodation*, an individual's handicap does not prevent the individual from ... performing the duties of a particular job or position." M.C.L. § 37.1103(*l*)(i) (emphasis added). Thus, in order to have a MHCRA claim, Plaintiffs would have to show, *inter alia*, that

Sherman had a handicap which either did not interfere with his job or which would not interfere with his job if reasonably accommodated. *See, supra*, M.C.L. §§ 37.1202(b), (g); *see also* M.C.L. § 37.1210 (establishing which accommodations pose undue burdens). M.C.L. § 37.1210(18), however, also states:

A handicapper may allege a violation against a person regarding a failure to accommodate under this article only if the handicapper notifies the person in writing of the need for accommodation within 182 days after the date the handicapper knew or reasonably should have known that an accommodation was needed.

Plaintiffs have not provided this Court with any evidence on whether Sherman's dyslexia "substantially limits 1 or more of the major life activities" of Sherman. There are no medical reports in the record to substantiate Plaintiffs' claim that Sherman suffers from dyslexia or that it interferes with his ability to read, organize, and calculate. Indeed, Sherman specifically testified that he did not believe his dyslexia affected his work. *See, supra*, p. 1174. Without any evidence that Sherman's alleged dyslexia significantly interfered with his life in any way, the Court has no choice but to hold that he is not "handicapped" as defined by MHCRA.

 Plaintiffs are also unable to show that Sherman was discharged by OIS. It is undisputed that at the October 20, 1992 review, and again in the October 26, 1992 telephone call, Ewald told Sherman that he had options, including the option to stay with the company and improve his performance. Rather than discuss these options further with OIS, Sherman chose instead to rely upon a second-hand story that he was already discharged as his excuse for not returning to work.

The Court finds that the alleged Luo–Wilson conversation is hardly a basis for a finding of a constructive discharge. In *Le Galley v. Bronson Community Schools*, 127 Mich.App. 482, 339 N.W.2d 223 (1983), the Michigan Court of Appeals defined "constructive discharge:"

The term "constructive discharge" has been used to describe a facially voluntary

termination which should legally be considered an involuntary one. A constructive discharge occurs "when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." ... A constructive discharge involves the employer's deliberate effort to make things difficult for an employee thus forcing him or her to resign.... Before a constructive discharge may be found, the trier of fact must be satisfied that working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign....

339 N.W.2d at 225–26 (citations omitted).

Applying the above test, the Court concludes that a single conversation—not even witnessed by Sherman, and in direct contradiction to what Sherman's supervisor told him two different times after the conversation allegedly occurred—is manifestly not, as a matter of law, sufficient to constitute a viable claim of constructive discharge. The record indicates that OIS attempted to play fairly with Sherman, both in terms of laying out its expectations long before it considered discharging Sherman and in offering him assistance, accommodation, and second chances right up until his last day of work so that he could meet those expectations. Given this record, the Court has no alternative but to conclude that Sherman's decision not to return to work was his own. The Court simply does not believe that a report of a single conversation, one which flew in the face of what Sherman heard himself from his supervisor, creates a material issue of fact on whether Plaintiff had no choice but to quit.

■ Even assuming, *arguendo*, that Sherman is handicapped by virtue of his dyslexia, and that he was constructively discharged, there is no evidence of record that OIS held any discriminatory animus towards him. For example, there is no showing that OIS treated Sherman differently because of his dyslexia, or even that it replaced him with a non-handicapped employee. Plaintiffs instead rely primarily on the fact that Sherman's supervisor, Tim Ewald, discussed Sherman's dyslexia with him in their October 20, 1992 meeting to show that OIS acted discriminatorily. However, the record indicates that Ewald and Sherman discussed his dyslexia in the context of determining if OIS could accommodate Sherman in any way so that he could perform his job. Moreover, Sherman rejected the offer of accommodation at the meeting, and at no point in his tenure at OIS did he make a request for accommodation in accord with M.C.L. § 37.-1210(18). Given Sherman's rejection of OIS' offer to accommodate, and his failure to request accommodation himself pursuant to M.C.L. § 37.1210(18), the Court holds that Ewald's mention of Sherman's dyslexia does not, without more, create a question of material fact on whether OIS had any discriminatory intent.

Plaintiffs alternatively suggest that proof of OIS' discriminatory intent also lies in the fact the company deliberately gave Sherman too much work that it knew or should have known a dyslexic could not handle. OIS ostensibly overloaded Sherman in order to ensure he would fail and, thereby, be dischargeable. *See* Plaintiffs' Brief, pp. 16–17.

The record reveals, however, that OIS did everything it could to ensure that Sherman completed his designated projects in a reasonable time-frame. It is undisputed that it was Sherman who set the deadlines for the five projects he was doing for Ewald. Thus, the Court believes OIS could reasonably expect Sherman to meet them, or at least be the person to initiate any necessary extensions.

Furthermore, the fact that Sherman accepted work from other departments does not show discriminatory animus. As an initial matter, Sherman conceded that these were "small jobs" which, presumably, should not have interfered with his bigger projects for Ewald. Moreover, Ewald offered uncontradicted testimony that he told his employees that they could accept other work *only if it would not interfere with work that they were doing for him.* OIS cannot, therefore, be held responsible for Sherman's inability to say no when he was expressly told by Ewald, in two progress meetings in April and June, exactly what work he needed to have done for his own department.

All of this evidence leads the Court to conclude that no reasonable jury could decide that OIS had any discriminatory animus toward Sherman because of his dyslexia. Sherman never viewed his alleged handicap as an impediment to his work, nor did he communicate such a concern to OIS even when specifically asked about it. OIS, then, cannot be faulted for believing that Sherman was simply an inefficient mechanical engineer.

■ Even assuming Sherman has made out a *prima facie* case of handicap discrimination, the Court notes that he has presented no evidence that OIS' articulated reason for his discharge—poor performance—was mere pretext for discrimination. Ewald conducted two extensive performance reviews with Sherman in June and October of 1992, and he carefully documented the negative results. Certainly by the June 1992 review, Sherman was on notice that he was not performing up to expectations. Furthermore, by the October review, Sherman knew that he was close to discharge. Ewald nonetheless continued to offer Sherman the possibility of continued employment if he brought up his productivity.

In light of these undisputed facts, the Court finds that OIS acted in a legitimate and non-discriminatory fashion toward Sherman. His performance problems are well-documented, and the record also reveals that OIS went more than an extra mile to attempt to keep Sherman on the job even after these problems had persisted for months. In the end, Sherman was the one who ended his employment with OIS, not the other way around. The Court therefore dismisses Plaintiffs' MHCRA claim.

## C. *PLAINTIFFS' ADA CLAIM MUST BE DISMISSED.*

■ The Court also believes that Plaintiffs' ADA claim must fail. In the first place, the Court is entitled to dismiss this count because Sherman has failed to comply with the procedural prerequisites for bringing an ADA claim. ADA § 107, 42 U.S.C. § 12117(a), specifically incorporates by reference the enforcement mechanisms set out in Title VII of the Civil Rights Act of 1964. That act requires a claimant who wishes to bring a court suit, *inter alia,* to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged discrimination. 42 U.S.C. § 2000e–5(e) (filing period for claimants in states, like Michigan, which have their own fair employment laws). Title VII further provides that "a civil action may be brought against the respondent named in the charge ... by the person claiming to be aggrieved" within 90 days of receipt of what is known as a "right-to-sue" letter from the EEOC. 42 U.S.C. § 2000e–5(f)(1).

The U.S. Supreme Court has held that complying with the 300–day EEOC charge-filing period is not a jurisdictional prerequisite for a Title VII court suit; rather, the filing period acts as a statute of limitations and is subject to waiver, estoppel, and/or equitable tolling. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 392–393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982). The Sixth Circuit has left open the question of whether the receipt of a right-to-sue letter is necessary for a district court to exercise jurisdiction over a Title VII suit. *Puckett v. Tennessee Eastman Co.,* 889 F.2d 1481, 1488 (6th Cir.1989). *Puckett* noted, however, that "every circuit presented with the issue has decided that the receipt of a right-to-sue letter prior to filing a Title VII action is not a jurisdictional prerequisite...." 889 F.2d at 1487. Given these holdings, the Court believes that it has jurisdiction to decide Plaintiffs' ADA claim on the merits as well as procedurally, even though Plaintiffs did not file a charge with the EEOC or receive a right-to-sue letter.

Plaintiffs' claim is defective procedurally because Plaintiffs have never filed a charge of disability discrimination with the EEOC. Unfortunately for Plaintiffs, ADA is very clear. If a claimant fails to file a timely charge with the EEOC, he cannot pursue a claim based on the statute. *See Kent v. Director, Missouri Dept. of Elementary & Secondary Educ.,* 792 F.Supp. 59, 62 (E.D.Mo.1992), *remanded on other grounds,* 1993 WL 72395, 1993 U.S.App. LEXIS 4813 (8th Cir. March 17, 1993). Because Plaintiffs did not file a charge with the EEOC within

300 days of Sherman's allegedly discriminatory termination on October 26, 1992, his ADA claim is presumptively time-barred.

Plaintiffs argue that there should be an exception to the EEOC charge-filing requirement for ADA suits filed initially in state court. The Court does not believe, however, that the statute countenances such an exception. ADA expressly states that "a civil action"—with no distinction drawn between state and federal actions—may not be brought unless one receives a right-to-sue letter from the EEOC after filing a charge with that agency. If Congress had meant to exclude ADA suits in state courts from the EEOC charge-filing requirement, it could have easily done so. Furthermore, Plaintiffs cite no case, nor has this Court been able to locate any, in which the filing of a state court action vitiated ADA's charge-filing requirement.

Plaintiffs also urge the Court to equitably toll the EEOC charge-filing period—although they fail to identify any factors which would warrant such a decision. In any case, the Court does not believe that this action is one in which equitable tolling is appropriate. It is true that Plaintiffs filed their suit in state court within 300 days of Sherman's allegedly discriminatory termination. OIS, therefore, had prompt notice of the alleged discrimination, and an opportunity to resolve the same. The Court also notes that certain courts have found that filing in an improper forum is possible grounds for tolling the EEOC charge-filing period. *See, e.g., Barrow v. New Orleans S.S. Ass'n*, 932 F.2d 473, 478 (5th Cir.1991) ("pendency of suit between same parties in the wrong forum" is grounds for tolling ADEA's charge-filing period); *Miller v. International Tel. & Tel. Corp.*, 755 F.2d 20, 24 (2d Cir.1985) (assertion of rights in the wrong forum might warrant equitable tolling of ADEA charge-filing period), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985).

The Court, however, believes that this case is distinguishable from those in which equitable tolling permitted claimants to go back and file EEOC charges long after the alleged discriminatory event took place. In the instant case, it is uncontroverted that Plaintiffs retained counsel prior to Sherman's last day of work on October 26, 1992. *See* OIS' Reply Brief, p. 2. This is important, because numerous courts have held that a discrimination claimant who retains counsel has constructive knowledge of his rights and responsibilities under fair employment laws. *See, e.g., Jackson v. Richards Medical Co.*, 961 F.2d 575, 579 (6th Cir.1992); *Kale v. Combined Ins. Co.*, 861 F.2d 746, 752–53 (1st Cir.1988). Given Plaintiffs' constructive notice of the necessity of filing a charge as early as the day Sherman left work in October, 1992, the Court does not believe that Plaintiffs' failure to file a charge should be in any way excused well over a year later.

Even if Plaintiffs' failure to file an EEOC charge was forgivable at the time Plaintiffs filed their complaint, their refusal to file a charge after receipt of OIS' April 26, 1993 answer warrants dismissal of their ADA count. OIS clearly stated in that answer that one of its affirmative defenses was Plaintiffs' failure to follow ADA's procedural requirements. Plaintiffs were, therefore, put on actual as well as constructive notice of the EEOC charge-filing requirement by virtue of OIS' answer. Still, at no point in this action did Plaintiffs initiate the necessary administrative agency action.

At least one court has held that once the circumstances warranting equitable tolling no longer exist, a claimant should only be allowed a "reasonable time" afterwards in which to file a charge. *See Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 452–53 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991). The Court agrees with this analysis, and it holds further that the nine months between receipt of OIS' April 26, 1993 answer and the February 3, 1994 hearing on OIS' summary judgment motion was far more than a reasonable time period in which Plaintiffs could have withdrawn this count and filed a charge with the EEOC. The Court, therefore, concludes that Plaintiffs' failure to file a charge with the EEOC on their ADA claim mandates its dismissal with prejudice.

■ The Court adds that it believes dismissal of this count is also appropriate after a review of the merits. The analysis applied

to Plaintiffs' MHCRA claim controls, for the most part, their ADA count as well. The Sixth Circuit follows the *prima facie* case/ legitimate, non-discriminatory reason/ pretext for discrimination analysis set forth above. *See Roush v. KFC Nat'l Mgt. Co.*, 10 F.3d 392, 396 (6th Cir.1993). In order to make out a *prima facie* case, Plaintiffs must show the following: (1) Sherman was "disabled" as defined by the statute; (2) he was qualified, with or without accommodation, to do his job; (3) he was discharged; and (4) he was replaced by a non-disabled person. *See Roush*, 10 F.3d at 396.

■ The Court again concludes that Plaintiffs cannot make out a *prima facie* case of discrimination. As an initial matter, ADA defines "disability" with the same language as MHCRA defines "handicap." *See* 42 U.S.C. § 12102(2). Thus, in the same way Sherman was not handicapped under MHCRA, he is not disabled under ADA. *See, supra,* p. 1177. Furthermore, even assuming that Sherman is disabled, the Court has already held that he was not constructively discharged; instead, he quit. Thus, he cannot make out this prong of his *prima facie* case of discriminatory discharge either. And, lastly, Plaintiffs point to no evidence in the record that Sherman was replaced by a non-disabled person.

Even assuming that Plaintiffs can somehow make out the elements of a *prima facie* case, the Court is convinced, for the reasons set out above, that no reasonable jury would find that OIS acted in anything but a legitimate and non-discriminatory manner toward Sherman. Summary judgment for OIS on Plaintiffs' ADA count is, therefore, also appropriate.

#### D. *PLAINTIFFS' NEGLIGENCE CLAIM MUST BE DISMISSED.*

■ Plaintiffs also allege that OIS was negligent in failing to perform its duty not to discriminate against Sherman under the various fair employment statutes. OIS correctly points out, however, that the remedies of these statutes are exclusive. There was, and is, no common law anti-discrimination duty; and there is no claim that MHCRA and ADA remedies would fail to fully compensate Plaintiffs for any discrimination Sherman claims to have suffered. *See Pompey v. General Motors Corp.*, 385 Mich. 537, 189 N.W.2d 243, 251 (1971). *See also Dudewicz v. Norris–Schmid, Inc.*, 443 Mich. 68, 503 N.W.2d 645, 649 (1993). This count, then, is also dismissed.

#### E. *PLAINTIFFS' WRONGFUL DISCHARGE CLAIM MUST BE DISMISSED.*

■ Plaintiffs further claim that OIS breached an implied just-cause employment contract. They base this cause of action on one of the alternatives that Ewald offered Sherman at the October 20 review; namely, that if he would improve his performance he could keep his job.

Plaintiffs' claim is simply ludicrous. OIS correctly points out that, as an initial matter, he quit employment rather than explore Ewald's suggestion to stay with the company. Thus, this case presents no claim for wrongful discharge, and, furthermore, the facts do not indicate that Sherman accepted the alleged just-cause contract by continuing to work.

■ Even assuming that Sherman was discharged, Ewald's statement hardly created an objectively reasonable expectation of just-cause employment. Michigan law is very clear that "oral statements of job security must be clear and unequivocal to overcome the presumption of employment at will." *Rowe v. Montgomery Ward & Co.*, 437 Mich. 627, 473 N.W.2d 268, 275 (1991). In *Rowe,* for example, the Michigan Supreme Court refused to find a just cause contract when plaintiff was told she had a job with her employer as long as she sold her quota of merchandise. 473 N.W.2d at 275.

Applying the *Rowe* test to the instant case, Ewald's suggestion that Sherman *might* be able to keep his job if his performance improved could not, as a matter of law, instill in him any reasonable expectation of lifetime employment at OIS. At the time the statement was made, Sherman had just received his second poor review in five months, and he knew that OIS was considering his discharge. Ewald identified the suggestion that Sher-

man could stay with the company provided he improved his productivity as merely one option Sherman should consider in addition to looking for work elsewhere or being discharged. Given Sherman's precarious situation at the company, and the innocuous nature of the statement that if he worked harder he might be able to stay on, this Court can only conclude that no reasonable jury would find that there existed anything close a just-cause employment contract. Summary judgment on this count, therefore, is appropriate.

### F. PLAINTIFFS' ADEA CLAIM MUST BE DISMISSED.

■ Plaintiffs' claim of age discrimination is also ripe for dismissal. As with their count under ADA, Plaintiffs failed to pursue the proper procedural path set out in ADEA. That statute provides:

No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission. Such charge shall be filed— ... within 300 days after the alleged unlawful practice occurred....

29 U.S.C. § 626(d)(2) (300 day filing period applies to claimants in states, like Michigan, which have fair employment laws of their own). ADEA further requires a claimant to wait until he receives a right-to-sue letter from the EEOC before he initiates a court suit. 29 U.S.C. § 626(e).

As noted above, the 300-day charge-filing rule and receipt of a right-to-sue letter are both not, under current Sixth Circuit law, jurisdictional prerequisites for a district court to hear an ADEA claim. The Sixth Circuit has held, however, that a court may not exercise its jurisdiction over an ADEA suit until the EEOC has had at least 60 days to attempt conciliation. *Chapman v. City of Detroit,* 808 F.2d 459, 462 (6th Cir.1986).

In *Chapman,* the district court dismissed plaintiffs' ADEA suit with prejudice for a number of reasons, one of which was their failure to give the EEOC the necessary sixty-day notice of their intent to file suit. The *Chapman* court stated that normally failure to comply with the sixty-day notice rule should result in a dismissal without prejudice. However, the court affirmed the district court's dismissal with prejudice because plaintiffs' claim was barred by another procedural section of the statute, namely, 29 U.S.C. § 626(c)(1), which terminates private causes of action if the EEOC brings a suit on behalf of the private claimants. 808 F.2d at 462–63.

The Court reads *Chapman* to hold that a district court may properly dismiss with prejudice an ADEA suit filed in violation of the jurisdictional 60-day rule if the court has an alternative procedural ground for its decision to dismiss. In the instant case, such an alternative ground exists in that, as noted above, Plaintiffs did not file a charge with the EEOC within 300 days of the alleged discriminatory action. Therefore, the Court holds that dismissal with prejudice of Plaintiffs, ADEA count for failure to comply with 26 U.S.C. § 626(d) is proper.[6]

### G. PLAINTIFF GAIL ANN SHERMAN'S DERIVATIVE CLAIM FOR LOSS OF CONSORTIUM MUST BE DISMISSED.

Because this Court has dismissed all of Plaintiff Charles A. Sherman's claims, Mrs. Sherman's derivative claim for loss of consortium is also mooted.

### H. PLAINTIFFS' COUNSEL, DONALD M. CUTLER, IS ORDERED TO SHOW CAUSE WHY HE SHOULD NOT PAY OIS' FEES AND COSTS FOLLOWING SHERMAN'S DEPOSITION.

■ As noted above, the hearing on this motion took place on February 3, 1994. Plaintiffs' counsel, Donald M. Cutler, chose not to be present and instead sent a very junior associate to argue the motion. Although Mr. Cutler's associate acquitted him-

---

6. In addition, the Court feels compelled to note that Plaintiffs' ADEA claim is frivolous on the merits. In his deposition, Sherman conceded that OIS in no way acted with any hint of age bias. *See, supra,* pp. 1175–76. Plaintiffs' ADEA count, then, would not have survived summary judgment even if Plaintiffs had followed all of ADEA's procedures.

self as best as he could under the circumstances, the Court finds that Mr. Cutler's decision to absent himself rather than face the music to be an unfortunate example of professional cowardice. If this hearing on a dispositive motion against his clients, case was not of sufficient moment to attract Mr. Cutler's attention and attendance, then Mr. Cutler should not have burdened Defendant with the costs of litigating the case.

This observation provides an appropriate segue into the next, more important point: The Court finds that Mr. Cutler's failure to withdraw this suit or, alternatively, to withdraw as counsel should his clients not agree to dismiss the suit, constitutes potentially sanctionable conduct under Fed.R.Civ.P. 11. Once Sherman's deposition was completed, it should have been clear that the case was without factual support or legal merit, and counsel should have discontinued suit at that point. Pursuant to Rule 11, then, this Court orders Mr. Cutler to show cause why he should not be sanctioned in the amount of OIS' fees and costs following Sherman's deposition. The Court will set a date and time for a hearing on this matter, and Mr. Cutler is advised that he must file any brief he may wish to present to the Court at least three days prior to that hearing.

### IV. *CONCLUSION*

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that OIS' motion for summary judgment on all counts is GRANTED. Judgment for OIS shall be entered accordingly.

IT IS FURTHER ORDERED that, consistent with the instructions of this opinion, Plaintiffs' counsel, Donald M. Cutler, is to show cause why he should not be sanctioned under Fed.R.Civ.P. 11.