USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 94-1306 STEPHANIE S. SMITH, Plaintiff, Appellant, v. STRATUS COMPUTER, INC., Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Laurence M. Johnson, with whom Ann E. Johnston and Fordham & ____________________ _________________ _________ Starrett, P.C., were on brief for appellant. ______________ Samuel A. Marcosson, Attorney, James R. Neely, Jr., Deputy _____________________ ______________________ General Counsel, Gwendolyn Young Reams, Associate General Counsel, and _____________________ Vincent J. Blackwood, Assistant General Counsel, were on brief for the ____________________ Equal Employment Opportunity Commission, amicus curiae. David H. Erichsen, with whom Peter A. Spaeth, Ann K. Bernhardt, __________________ ________________ ________________ and Hale and Dorr, were on brief for appellee. _____________ ____________________ November 21, 1994 ____________________ STAHL, Circuit Judge. Plaintiff Stephanie S. Smith STAHL, Circuit Judge. _____________ sued her former employer, Stratus Computer, Inc. ("Stratus"), for illegal sex discrimination. The district court granted summary judgment for Stratus and Smith appeals. We affirm. I.  I.  __ Standard of Review and Background Standard of Review and Background _________________________________ A. Standard of Review ______________________ Because we are reviewing a grant of summary judgment, we view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in plaintiff's favor. Woods v. Friction Materials, Inc., 30 _____ _________________________ F.3d 255, 259 (1st Cir. 1994). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial, there can no longer be a genuine issue as to any material fact: the failure of proof as to an essential element necessarily renders all other facts immaterial, and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. _____________ Catrett, 477 U.S. 317, 322-23 (1986). See also Woods, 30 _______ ___ ____ _____ -2- 2 F.3d at 259. Even in an employment discrimination case, "`where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" Goldman v. First _______ _____ Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) _____________________ (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d ____________ __________________________ 5, 8 (1st Cir. 1990)). B. Factual and Procedural Background _____________________________________ Smith was hired in May 1989 as director of product marketing by Stratus, a Marlboro, Massachusetts, corporation that designs, manufactures and sells "fault-tolerant" computer systems and products -- i.e., products that enable customers to remain on-line in the event of a system failure. Previously, Smith had worked for more than five years as a marketing director for another Boston-area computer company and had earned master's and doctoral degrees in psychology from the University of Illinois. Smith received from Stratus a $115,000 starting salary, a $15,000 sign-on bonus, and options on 7,000 shares of Stratus stock. Smith's first months at Stratus proceeded smoothly. In December 1989, William Thompson, Smith's supervisor and Stratus's senior vice-president of marketing, gave her a favorable performance review. Thompson described Smith's start at Stratus as "excellent," and wrote that she was -3- 3 "perceived as a substantial and valuable contributor to Stratus." Thompson rated Smith's overall performance as "exceed[ing] expectations in several significant areas," the second-highest of five possible performance ratings. Contemporaneous with her review, Smith received a 5% raise and stock options for an additional 1,500 shares. Around January 1990, as part of a company reorganization, Smith came under the direct supervision of Stratus co-founder Robert Freiburghouse, who held the title of senior vice-president for marketing and engineering. Before the reorganization, Thompson had recommended that Smith be promoted to vice-president for product marketing -- a title that Smith thought was critical to her effective interaction with executives in other departments. Freiburghouse did not act immediately on Thompson's recommendation; he testified in his deposition that he was uncertain about her qualifications for the title. In April 1990, however, after personally supervising Smith for four months, Freiburghouse recommended that Smith be named a vice- president. In June 1990, Smith received a 4.8% raise in recognition of her new title as well as another 5% merit raise, bringing her annual salary to $133,000. Although the record contains no formal evaluation of Smith's work by Freiburghouse, Smith stated that Freiburghouse told her that -4- 4 she was one of his top two employees, and that John Young, Stratus's vice-president for human resources, told her that Freiburghouse was very enthusiastic about her performance. In deposition testimony, Freiburghouse described Smith's performance only as "satisfactory." Freiburghouse did say, however, that if she had not been performing well enough to merit the title of vice-president, he would not have recommended her promotion. In the fall of 1990, Smith learned that the company would again be reorganized at the end of that year, this time bringing her under the supervision of Gary Haroian, Stratus's general manager of corporate operations. The prospect of working for Haroian worried Smith. Haroian had a different view of marketing's proper function within the company; he thought marketing should focus more on supporting the sales staff and conducting rigorous pricing analyses and less on product development, which he saw as the purview of the engineering department. Months earlier, Haroian had expressed some reservations to Freiburghouse about Smith's promotion to vice-president, although the evidence does not indicate whether Smith ever learned about this. Smith did know, however, about Haroian's differing vision of the marketing function; she testified in her deposition that she knew he "wasn't a fan." In a meeting with Freiburghouse before the change took effect, Smith -5- 5 expressed her concern about working for Haroian, even asking Freiburghouse if she should quit. In her deposition, Smith testified that she was not serious about quitting, but was merely soliciting reassurance from Freiburghouse that she was generally on the right track and would be able to work things out with Haroian. Things did not work out, though -- at least from Haroian's perspective. Although Smith testified that she received no indication that anything was seriously amiss until a June 12, 1991, meeting with Haroian, Haroian testified that the meeting was the culmination of several weeks of mounting frustration over Smith's failure to redirect the marketing effort in the way he desired. In addition, Haroian testified that he had been hearing numerous complaints about Smith's leadership and poor morale within the marketing group. At the June 12 meeting, Haroian outlined the problems he perceived, and Smith asked him whether she should just take a severance package (Smith testified that, as was her habit, she was reacting emotionally, and was not serious about quitting). Haroian, however, told Smith not to worry, that things were not all that bad, and that he would think about how to proceed during Smith's vacation, which was to begin the next day. Smith went home that night and drafted a handwritten memo to -6- 6 Haroian outlining how she proposed to solve the problems he perceived in marketing. While Smith was on vacation, Haroian heard further complaints about Smith's lack of leadership and focus from mid-level managers who reported directly to Smith. At the end of June, Haroian spoke with Stratus's president, William Foster, and Stratus's human resources vice-president, John Young, about removing Smith from her position as marketing vice-president. Both of them agreed that Haroian should take such action. On July 1, 1991, the day Smith returned from vacation, Haroian met with Smith in his office and informed her that he was removing her from her job as marketing vice- president. Exactly what happened next is disputed, but we accept Smith's version of events. Haroian offered her a severance package extending over six months, which Smith rejected as unacceptably short. Then, and only then, Smith claims, did Haroian offer her another position in the company -- a position on Haroian's staff with unspecified duties, coextensive with the proposed severance period. Smith interpreted Haroian's actions as termination of her employment rather than a suggestion that she be permanently reassigned; no one at Stratus ever advised her differently. The day after her meeting with Haroian, Smith cleared out her office at Stratus. A week later, she called a meeting with -7- 7 her staff and announced that she was leaving, without making clear to them whether she had been fired or had resigned. During the week following her termination, Smith met with John Young and another human resources manager, Richard Marciante, to discuss her situation. Smith claims that Marciante told her that she should not be overly concerned about losing her job since her husband was employed and could at least provide the family with one income. Smith claims that her treatment was markedly different from that of male vice-presidents and managers whose performances were deemed unsatisfactory. Those employees, Smith claims, either received more generous severance packages than the six months offered to Smith or were offered other suitable employment within the company. In mid-July, when Smith asked Haroian why she was being treated differently from these other executives, Haroian simply shrugged. When Smith asked John Young the same question, Young told her that he had asked Haroian that __ question, and that Haroian had told Young that he simply thought it better to sever Smith completely. Smith filed complaints on October 15, 1991, with both the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission.1 Smith  ____________________ 1. Smith requested and received permission to withdraw her complaints before both these agencies and pursue a private action. -8- 8 commenced this action on January 13, 1992, by filing a complaint in federal district court. In her complaint, Smith charged Stratus with illegal discrimination on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e,2 violation of the Equal Pay Act of 1963, 29 U.S.C. 206(d)(1), and violations of various Massachusetts laws. On October 8, 1993, the district court granted Stratus's motion for summary judgment on the federal claims, concluding that Smith had failed to adduce sufficient evidence to support a jury finding that Stratus's stated reason for dismissing her was a pretext for discrimination.3 This appeal followed. II.  II.  ___ Discussion Discussion __________  ____________________ 2. Title VII of the Civil Rights Act of 1964 provides in relevant part: It shall be an unlawful employment practice for an employer-- (1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . . 42 U.S.C. 2000e-2(a). 3. The district court also ruled there was insufficient evidence to proceed on Smith's claim under the Equal Pay Act. Smith does not contest that ruling in this appeal. The district court "remanded" Smith's state law claims to state court pending the outcome of this appeal. -9- 9 Smith makes two arguments on appeal. First, she argues that the district court misinterpreted the Supreme Court's holding in St. Mary's Honor Center, Inc. v. Hicks, ______________________________ _____ 113 S. Ct. 2742 (1993), when it required her to adduce evidence that Stratus's stated reason for her dismissal was a pretext for discrimination. Second, Smith argues that even ___________________ if the district court interpreted Hicks correctly, its grant _____ of summary judgment should nonetheless be reversed because Smith introduced sufficient evidence to show that Stratus's proffered reason for her dismissal was a pretext for discrimination. We address each argument in turn. A. The District Court's Interpretation of St. Mary's v. _____________________________________________________________ Hicks _____ When a Title VII plaintiff is unable to offer direct proof of her employer's discrimination -- as is usually the case and was so here -- we allocate the burden of producing evidence according to the now-familiar framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, _______________________ _____ 802-05 (1973). See Hicks, 113 S. Ct. at 2746. Under this ___ _____ framework, the plaintiff bears the initial burden of establishing a prima facie case of sex discrimination. She must show that (1) she is a member of a protected class; (2) she was performing her job at a level that rules out the possibility that she was fired for inadequate job performance; (3) she suffered an adverse job action by her -10- 10 employer; and (4) her employer sought a replacement for her with roughly equivalent qualifications. Mesnick v. General _______ _______ Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991), cert. denied, _________ _____ ______ 112 S. Ct. 2965 (1992). If the plaintiff successfully bears this relatively light burden,4 we presume that the employer engaged in impermissible sex discrimination. Texas Dept. of ______________ Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). _________________ _______ If the employer articulates a legitimate, non- discriminatory reason for its decision, however, the presumption of discrimination vanishes, and the burden of production shifts back to the plaintiff. The plaintiff must  ____________________ 4. Stratus argues that Smith failed to satisfy her prima facie burden by not putting forth evidence sufficient to show that she was qualified for the position, i.e., "`that [s]he was doing [her] job well enough to rule out the possibility ____________________________ that [s]he was fired for inadequate job performance, absolute or relative.'" Menard v. First Sec. Serv. Corp., 848 F.2d ______ _______________________ 281, 285 (1st Cir. 1988) (quoting Loeb v. Textron, 600 F.2d ____ _______ 1003, 1012 (1st Cir. 1979)). Stratus argues that Smith's evidence of her adequate performance, consisting primarily of a dated performance evaluation, pay increases and stock options, in no way rules out the possibility that she was fired for performing inadequately at the time in question. The plaintiff's prima facie burden in Title VII cases, however, is "not onerous." Mesnick, 950 F.2d at 823 _______ (1991). We have interpreted the prima facie requirement at issue to mean that the plaintiff must put forth sufficient evidence to "support an inference that [the plaintiff's] job performance at the time of her discharge was adequate to meet [the employer's] legitimate needs." Keisling v. Ser-Jobs For ________ ____________ Progress, Inc., 19 F.3d 755, 760 (1st Cir. 1994). In _______________ Keisling, we held that a plaintiff's evidence of increased ________ responsibilities over time, positive feedback and pay increases -- evidence similar to that adduced by Smith -- satisfied this element, even though the evidence did not extend right up to the time of her discharge. We think that Smith's evidence reasonably supports the same inference, and thus we hold that she satisfied her prima facie burden. -11- 11 then introduce sufficient evidence to support two additional findings: (1) that the employer's articulated reason for the job action is a pretext, and (2) that the true reason is discriminatory. Woods, 30 F.3d at 260. The plaintiff may _____ rely on the same evidence to prove both pretext and discrimination, but the evidence must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by discriminatory animus. See Goldman, 985 ___ _______ F.2d at 1117-18. Smith argues that under Hicks, a Title VII _____ plaintiff's burden in this final stage does not include ___ adducing evidence that an employer's true motivation was discriminatory. In other words, Smith contends that a factfinder presented with sufficient evidence of pretext but no evidence of discrimination may always reasonably infer ______ that the employer's true motivation was discriminatory, and that summary judgment against the plaintiff would therefore be precluded in such circumstances. Thus, Smith asserts, the district court's grant of summary judgment was improper because a jury should have been permitted to infer from Smith's evidence of pretext that the true reason for her maltreatment was sex discrimination. Smith's argument rests primarily on a passage from Hicks in which the Court noted that "[t]he factfinder's _____ disbelief of the reasons put forward by the defendant -12- 12 (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie ___ case, suffice to show intentional discrimination." Hicks, _____ 113 S. Ct. at 2749 (emphasis added). Our recent opinion in Woods squarely addressed this issue, and we will not revisit _____ it at length here. As stated in Woods, we interpret the _____ above passage from Hicks as making clear _____ that the Supreme Court envisioned that some cases exist where a prima facie case and the disbelief of a pretext could _____ provide a strong enough inference of actual discrimination to permit the fact- finder to find for the plaintiff. Conversely, we do not think that the Supreme Court meant to say that such a finding would always be permissible. . . ______ . The strength of the prima facie case and the significance of the disbelieved pretext will vary from case to case depending on the circumstances. In short, everything depends on the individual facts. Woods, 30 F.3d at 261 n.3. Thus, the district court _____ interpreted Hicks correctly when it ruled that, to survive _____ Stratus's summary judgment motion, Smith had to adduce sufficient evidence to support a finding that Stratus's stated reason was not only a pretext, but that it was a pretext for illegal sex discrimination. B. Smith's Evidence of Discrimination ______________________________________ Smith's second argument is that the district court erred in ruling that she failed to introduce sufficient evidence of Stratus's discriminatory animus. Upon review of -13- 13 the evidence, drawing all reasonable inferences in Smith's favor, we agree with the district court. Smith offers an abundance of evidence indicating that Stratus found her performance more than satisfactory and that, despite her concerns about working for Haroian, she heard no substantial criticism of her performance until her pre-vacation meeting with Haroian on June 12, 1991. Even if we assume arguendo that this evidence is sufficient to ________ support a finding of pretext, it could not, standing alone, possibly lead a reasonable jury to conclude that discriminatory animus was the real motivation behind Haroian's action. Title VII does not grant relief to a plaintiff who has been discharged unfairly, even by the most irrational of managers, unless the facts and circumstances indicate that discriminatory animus was the reason for the decision. See Mesnick, 950 F.2d at 825. ___ _______ Smith does offer other evidence purporting to show discriminatory animus. More specifically, Smith alleges that Stratus's treatment of her differed from that of a number of male vice-presidents, who, Smith claims, were bounced from their jobs but were afforded a much softer landing than she was offered. As we explain below, however, Smith's evidence is wholly inadequate to support these allegations in any relevant way. -14- 14 In a disparate treatment case, the plaintiff has the burden of showing that she was treated differently from "persons situated similarly `in all relevant aspects.'" The ________________________ ___ Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st ________________ _________________ Cir. 1989) (quoting Smith v. Monsanto Chemical Co., 770 F.2d _____ _____________________ 719, 723 (8th Cir. 1985), cert. denied, 475 U.S. 1050 (1986)) _____ ______ (emphasis added); see also Burdine, 450 U.S. at 258 ("[I]t is ___ ____ _______ the plaintiff's task to demonstrate that similarly situated employees were not treated equally"); Mack v. Great Atlantic ____ ______________ and Pacific Tea Co., 871 F.2d 179, 182 (1st Cir. 1989) _____________________ (affirming summary judgment where plaintiff failed to demonstrate that "comparably credentialed" employees received more favorable treatment). Thus, for us to compare Smith's treatment with that of terminated or transferred male executives in a meaningful way, Smith would have to show that she was similarly situated to those men in terms of performance, qualifications and conduct, "without such differentiating or mitigating circumstances that would distinguish" their situations. Mitchell v. Toledo Hosp., 964 ________ ____________ F.2d 577, 583 (6th Cir. 1992). This she has utterly failed to do. First, Smith points to the treatment afforded former Stratus vice-presidents Ray Hermo and Greg Sheard. Freiburghouse testified in his deposition that, although he knew nothing about the specifics of Hermo's and Sheard's -15- 15 situations, he knew that their supervisors had been dissatisfied with their respective performances. Young testified in his deposition that Hermo received a severance package, and that he was "sure there were others" who received such packages. Company records indicate that Sheard continued to receive his annual salary of $126,000 for up to nine months following his last day at the company. Smith also points to Freiburghouse's deposition testimony about Bill Murphy. According to Freiburghouse, Murphy filled a number of positions at different times at the company's request. Freiburghouse testified that Murphy, after completing his assigned task of eliminating a division of the company, was named vice-president of sales, North America Division. When asked if the company created that position for him, Freiburghouse testified that he did not know. Smith asserts in her brief that this evidence showed that Murphy "was removed from his position, and defendant Stratus created a position for him." Freiburghouse also testified that two other male vice-presidents, Jim Austin and Alex Lupinetti, were demoted twice to positions of lesser responsibility. As further evidence of disparate treatment, Smith points to the case of Bill Elliot, her predecessor as marketing vice-president. Elliot became vice-president of strategic planning, a position that Haroian described as "a -16- 16 high level individual contributor function," with only one staff person working for him. Smith's evidence fails to provide the factfinder with a sufficient basis on which to conclude that she was "similarly situated in all relevant aspects" to the male vice-presidents she names. Other than Freiburghouse's hearsay testimony that Sheard's and Hermo's supervisors were "dissatisfied" in some unspecified manner, we know nothing about the alleged performance problems of those two individuals or the level of dissatisfaction of their supervisors; as for the other four executives, there is no __ indication that their job changes were due to poor performance, nor would that be a permissible inference for a jury to make on this scant record. Thus, this sketchy evidence, lacking a sufficient foundation for a legally relevant comparison of Smith and the male executives, cannot support an inference that Smith's dismissal was motivated by discriminatory animus. Smith offers three additional snippets of evidence to prove Stratus's discriminatory animus. First, Smith points to Haroian's shrug in response to her question about why she was being treated differently than a number of male managers -- a tacit admission, she claims, of disparate treatment. Next, Smith offers her recollection that Young also asked Haroian why Smith was being treated differently -17- 17 than male vice-presidents and was told that Haroian simply thought it better to sever Smith completely. Finally, Smith points to Marciante's comment telling her not to worry since her husband still had an income. Haroian's shrug cannot be considered an admission of discrimination. First, in Smith's deposition testimony, she stated that she named the _____ executives when she posed the question to Haroian -- not that she asked him why she was being treated differently from males. Thus, Haroian was not even being presented with an _____ accusation of gender discrimination when he shrugged. Second, Haroian could have meant any number of things, or nothing at all, by his shrug; we find the shrug, under these circumstances, to be so ambiguous that it is not just "of little probative force," Menard v. First Sec. Serv. Corp., ______ _______________________ 848 F.2d at 288, but it is of absolutely no probative force whatsoever. We find little more probative value in Haroian's statement to John Young. Even assuming that Young actually asked Haroian why Smith was being treated differently than male executives -- and not why she had not been offered another position, as Smith's attorney suggests in a passage from Young's deposition to which Smith specifically directed our attention -- we fail to see how a reasonable jury could infer from Haroian's answer any hint of discriminatory animus. -18- 18 Finally, Marciante's comment lends itself to many possible interpretations. Smith claims that the comment smacks of gender bias, denigrates the importance of her career and "suggests a `men's club' atmosphere in which women executives are viewed as dilettantes." Brief of Plaintiff/Appellant at 45. Even if we accept this far- fetched interpretation of Marciante's comment, the fact remains that Marciante was a mid-level Stratus manager who did not participate in the decision to remove Smith from her job. Smith's failure to adduce any evidence that Marciante made or influenced the decision to remove Smith from her job makes the comment irrelevant to the issue of discriminatory animus. See Medina-Munoz, 896 F.2d at 10 ("The biases of one ___ ____________ who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case."). In sum, we find nothing in Smith's evidence that would permit a reasonable jury to infer that discriminatory animus motivated Stratus to remove Smith from her job. Thus, there is no genuine issue as to any material fact, and Stratus is entitled to judgment as a matter of law. See ___ Woods, 30 F.3d at 259. _____ For the foregoing reasons, the district court's grant of summary judgment is AFFIRMED. AFFIRMED. -19- 19