Tsetseranos v. Tech Prototype, Inc.   CV-93-676-SD   04/10/95 P

UNITED STATES DISTRICT COURT FOR THE

                        DISTRICT OF NEW HAMPSHIRE


Cheryl Tsetseranos

        v.                                    Civil No. 93-676-SD

Tech Prototype, Inc.


                            O R D E R


        In this civil action, plaintiff Cheryl Tsetseranos asserts

that her employment was terminated by Tech Prototype, Inc.,

because of her pregnancy and related medical conditions, in

violation of section 703(a)(1) of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e-2(a)(1), and the Pregnancy

Discrimination Act, 42 U.S.C. § 2000e(k); Title I of the

Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12117;

and New Hampshire Revised Statutes Annotated (RSA) 354-A:7.

Plaintiff also asserts a state-law claim for wrongful discharge.

        Presently before the court are defendant's motion for

summary judgment and defendant's motion to amend its answer, to

which plaintiff objects.



                            Discussion

1.  Summary Judgment Standard

        Under Rule 56(c), Fed. R. Civ. P., summary judgment is

appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

>Summary judgment is a procedure that involves shifting burdens between the moving and the nonmoving parties. Initially, the onus falls upon the moving party to aver "'an absence of evidence to support the nonmoving party's case.'" Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Once the moving party satisfies this requirement, the pendulum swings back to the nonmoving party, who must oppose the motion by presenting facts that show that there is a "genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)) . . . .

LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, ___ U.S. ___, 114 S. Ct. 1398 (1994).

>When [the nonmoving] party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial, there can no longer be a genuine issue as to any material fact: the failure of proof as to an essential element necessarily renders all other facts immaterial, and the moving party is entitled to judgment as a matter of law.

Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994) (citing Celotex Corp., supra, 477 U.S. at 322-23), petition for

2

<u>cert. filed</u>, 63 U.S.L.W. 3644 (U.S. Feb. 21, 1995) (No. 94-1416).

"Even in an employment discrimination case, '"where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."'" <u>Smith</u>, <u>supra</u>, 40 F.3d at 13 (quoting <u>Goldman v. First Nat'l Bank of Boston</u>, 985 F.2d 1113, 1116 (1st Cir. 1993) (quoting <u>Medina-Munoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990))).

In determining whether summary judgment is appropriate, the court construes the evidence and draws all justifiable inferences in the nonmoving party's favor. <u>Anderson</u>, <u>supra</u>, 477 U.S. at 255.

## 2. Plaintiff's Title VII Claim

Title VII prohibits discrimination in employment because of or on the basis of sex. 42 U.S.C. § 2000e-2(a) (1994).[1] In

---

[1]Section 2000e-2(a) provides in relevant part:

> It shall be an unlawful employment practice for an employer--
>    (1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . .

<span style="float:right">(continued...)</span>

3

1978, the Pregnancy Discrimination Act amended Title VII to define the phrases "because of sex" and "on the basis of sex" to include

> because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . . .

42 U.S.C. § 2000e(k).

The basic principle of the Pregnancy Discrimination Act "is that women affected by pregnancy and related conditions must be treated the same as other applicants and employees on the basis of their ability or inability to work." 29 C.F.R. Pt. 1604, App. at 197 (1994). "In the area of fringe benefits, such as disability benefits, sick leave and health insurance, the same principle applies. A woman unable to work for pregnancy-related reasons is entitled to disability benefits or sick leave on the same basis as employees unable to work for other medical reasons."[2] Id.

_____

[1](...continued)

[2]The Equal Employment Opportunity Commission (EEOC) regulations implementing the Pregnancy Discrimination Act provide in relevant part that "[d]isabilities caused or contributed to by
(continued...)

4

Plaintiff alleges that she was terminated because of her pregnancy and related medical conditions in violation of Title VII, as amended by the Pregnancy Discrimination Act. As plaintiff has produced no direct evidence of discrimination, the court analyzes her claim under the now-familiar burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

In applying the facts of this case to the <u>McDonnell Douglas</u> analytical framework, the court is mindful of the Supreme Court's oft-repeated admonition "that the Title VII plaintiff at all times bears the 'ultimate burden of persuasion.'" <u>St. Mary's Honor Ctr. v. Hicks</u>, ___ U.S. ___, ___, 113 S. Ct. 2742, 2479 (1993).

### a. Plaintiff's Prima Facie Case

The first stage of the <u>McDonnell Douglas</u> framework requires the plaintiff to make a prima facie showing of discrimination. In order to meet this burden under Title VII, plaintiff

> must show that (1) she is a member of a
> protected class; (2) she was performing her

---

[2](...continued)
pregnancy, childbirth, or related medical conditions, for all job-related purposes, shall be treated the same as disabilities caused or contributed to by other medical conditions, under any heath or disability insurance or sick leave plan available in connection with employment." 29 C.F.R. § 1604.10(b) (1994).

> job at a level that rules out the possibility that she was fired for inadequate job performance; (3) she suffered an adverse job action by her employer; and (4) her employer sought a replacement for her with roughly equivalent qualifications.

Smith, supra, 40 F.3d at 15 (citing Mesnick v. General Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991), cert. denied, ___ U.S. ___, 112 S. Ct. 2965 (1992)).  The plaintiff's burden of making out the prima facie case of discrimination is "'not onerous.'"  Id., 40 F.3d at 15 n.4 (quoting Mesnick, supra, 950 F.2d at 823).

In this case, it is undisputed that Tsetseranos was pregnant and had ovarian cysts at the time of her termination.[3]  Further, for the purposes of its summary judgment motion only, defendant concedes that plaintiff was replaced by someone with roughly equivalent qualifications.

Defendant asserts, however, that plaintiff cannot meet the second element of her prima facie case: that she was performing her job at a level that rules out the possibility that she was fired for inadequate job performance.  Because plaintiff's prima

---

[3]Defendant asserts that plaintiff cannot meet the first element of her prima facie case because Roger Somers, her immediate supervisor, had no knowledge of her pregnancy when he terminated her.  However, at this stage, plaintiff's burden is limited to showing that she is a member of a protected class. Defendant's knowledge of plaintiff's pregnancy and related medical conditions is not relevant until the final stage of the McDonnell Douglas framework, when plaintiff is required to show that defendant terminated her because of her medical conditions.

6

facie burden is not onerous, the First Circuit has interpreted the second element as requiring plaintiff to "put forth sufficient evidence to 'support an inference that [the plaintiff's] job performance at the time of her discharge was adequate to meet [the employer's] legitimate needs.'" Smith, supra, 40 F.3d at 15 n.4 (quoting Keisling v. SER-Jobs for Progress, Inc., 19 F.3d 755, 760 (1st Cir. 1994)) (alterations in Smith).

As proof of plaintiff's allegedly inadequate work performance, defendant submits an evaluation of Tsetseranos dated June 8, 1992. This evaluation indicates that Tsetseranos was meeting the standard for her "ability to do job assigned" and "productivity," but it also details problems in both of these areas. Tsetseranos Evaluation at 1 (attached to Affidavit of Roger Somers as Exhibit A). Further, plaintiff's cooperation, attitude, and initiative were all rated "good," but her work habits were characterized as "poor." Id. Her evaluator stated in his comments,

> Your work habits are affected by priority setting & organization problems. You must establish clear performance goals for the various aspects of your job so you can work smarter. You work very hard but mostly you are reacting to the phone or specific tasks as they come up rather than prioritizing and managing them systematically. This is very inefficient and wastes time.

7

<u>Id.</u>

In the overall comments section of the evaluation, the evaluator states, "In preparing for this review I was disappointed to discover that many of the issues I planned to discuss were also corrective action items from our last review. There has been improvement but you should have put many of these issues behind you by now." <u>Id.</u> at 2. The evaluation concludes with a list of nine problem areas for Tsetseranos to "work on."[4] <u>Id.</u> at 3.

The Employee Warning Report filled out by Somers on the day of plaintiff's termination states, "There has been no change

_____

[4]The nine problem areas listed in plaintiff's evaluation are:

> - Better follow up on orders in process especially hot or orders being expedited. To be sure they are processed and shipped on time. (Use a condensed open order report to follow up on orders due in the next 5 to 10 days.)
> - Better communication of late orders info to customers--requesting extensions in advance of due date.
> - Timely reports--late list--bookings report --monthly availability and schedules.
> - Establishing organization to routine duties to allow others to help.
> - Recording and prioritizing of requests and tasks.
> - Improved follow up on requests made to others.
> - Reducing phone time (socializing).
> - Sharply curtail personal phone calls.
> - Organize and manage the department for growth--don't be task oriented.

Tsetseranos Evaluation at 3.

8

since your review in level of mistakes[,] improved organization (in spite of attending a seminar) and the files are a mess--not reviewing PO's has cost us many losses . . . ." Employee Warning Report dated October 1, 1992 (attached to Somers Affidavit as Exhibit B). The explanation given in the report for plaintiff's discharge is, "No signs of improving or correcting problems." Id.

To support her contention that she was adequately performing her job, plaintiff points first to her earnings history. Plaintiff began working at Tech Prototype in May 1990 for $9.00 per hour or $18,720 per year. Affidavit of Cheryl (Tsetseranos) Jeffrey ¶ 2; ADP Employee Earnings Record for Cheryl Tsetseranos (attached to Jeffrey Affidavit as Exhibit A). Plaintiff received four raises in pay during the twenty-nine months she worked at Tech Prototype. Id. When Tsetseranos was terminated on October 1, 1992, she was earning $28,000 per year. Id.

Plaintiff states that following her June 8, 1992, evaluation, she attended a seminar on "organizing and prioritizing." She further states that "[d]uring the time period between the organizational seminar that I attended and my termination on October 1, 1992, no one at Tech Prototype ever complained or spoke to me about inadequate job performance." Jeffrey Affidavit ¶ 10.

Plaintiff also points to a conversation she had with Somers

9

on September 28, 1992, three days before she was terminated.  At her deposition, plaintiff testified about this conversation as follows:

> Towards the end of the day, we [Tsetseranos and Somers], as usual, we always talk about how our day went, and I ended up sitting at his office and conversation just turned to how things were going with me, and I explained to him that things were going well and the report seemed to be on time because we had--we needed to have our reports, Monday reports on time.  He asked if I started on my filing system, and I said, yes, and he asked me how far I got, and I started from A to C.
> Basically, he told me that he was satisfied with how everything was going.  Roger is a very upbeat kind of man, and he was very pleased.
> Q   Now, he was pleased based on what you told him, is that correct?
> A   He was pleased in what he saw between what me and Joe were doing on the invoices, and the fact that he had not had to ask for any reports.

Deposition of Cheryl Jeffrey at 40 (attached to Plaintiff's Objection).

After a careful review of the evidence submitted by both parties, the court finds that the evidence is sufficient to support an inference that plaintiff's job performance was adequate to meet Tech Prototype's legitimate needs.  This is sufficient to meet plaintiff's relatively light burden at the prima facie stage of her case.  The court therefore finds that plaintiff has made a prima facie showing of discrimination.

10

b. Employer's Rebuttal

"Under the <u>McDonnell Douglas</u> scheme, '[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee.'" <u>St. Mary's Honor Ctr.</u>, <u>supra</u>, ___ U.S. at ___, 113 S. Ct. at 2747 (quoting <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 245, 254 (1981)). "However, to rebut this presumption, the employer need only '<u>articulate</u> a legitimate nondiscriminatory reason for the employee's termination.'" <u>LeBlanc</u>, <u>supra</u>, 6 F.3d at 842 (quoting <u>Lawrence v. Northrop Corp.</u>, 980 F.2d 66, 69 (1st Cir. 1992)) (emphasis in <u>LeBlanc</u>).

"'The employer's burden at this stage is merely one of production; the burden of persuasion remains plaintiff's at all times.'" <u>Woods v. Friction Materials, Inc.</u>, 30 F.3d 255, 260 (1st Cir. 1994) (quoting <u>Lawrence</u>, <u>supra</u>, 980 F.2d at 69). In order to meet its burden of production, the defendant "'must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action." <u>St. Mary's Honor Ctr.</u>, <u>supra</u>, ___ U.S. at ___, 113 S. Ct. at 2747 (quoting <u>Burdine</u>, <u>supra</u>, 450 U.S. at 254-55 & n.8).

Plaintiff's immediate supervisor at Tech Prototype, Roger Somers, states in his affidavit,

11

When Cheryl worked at Tech Prototype, Inc., she had problems with her organizational skills and filing. She also had problems prioritizing her tasks. In addition, she made mistakes in quoting prices to customers.

The problems with her organizational skills were reflected in her performance review of June 8, 1992. In this performance review, Cheryl was admonished to improve her job performance in many areas. After the June review, the company sent Cheryl to a seminar on improving her job skills.

Somers Affidavit ¶¶ 3-4 (attached to Defendant's Motion). Somers further states,

In late September, 1992, I met with Cheryl regarding the progress she had made in her filing and organization. Cheryl told me that she had made improvements and had begun organizing her filing system. I was pleased and hopeful that Cheryl was making the necessary strides to address the concerns I had.

The day after Cheryl told me about the improvements she had made, she was out from work. I went into her office to get some information and discovered that Cheryl's office was a mess and the filing system was no better organized than it had ever been. I concluded that she had lied to me about the changes she had made. The level of organization did not meet the level expected of her. In addition to Cheryl's organizational shortcomings, there had been complaints from co-workers about her response to them and her inability to find information that she was responsible for filing, as well as Cheryl's misquoting prices to customers and timely invoicing. There were also customer complaints regarding prices. Prices misquoted by Cheryl resulted in lost revenue to the company.

Id. ¶¶ 5-6.

As a result of these problems, Somers decided that he "had

12

no choice but to terminate [plaintiff's] employment." Id. ¶ 7. Somers further states that his "decision to terminate Cheryl Tsetseranos was based entirely upon her unsatisfactory work performance." Id. ¶ 9.

The court finds that defendant has met its burden of production by offering evidence that plaintiff was terminated because of her unsatisfactory work performance.

### c.   Proof of Discriminatory Animus

Once "the employer articulates a legitimate, non-discriminatory reason for its decision, . . . the presumption of discrimination vanishes, and the burden of production shifts back to the plaintiff." Smith, supra, 40 F.3d at 16.  Then, at the third and final stage of the McDonnell Douglas framework, the plaintiff must "introduce sufficient evidence to support two additional findings: (1) that the employer's articulated reason for the job action is a pretext, and (2) that the true reason is discriminatory."  Id. (citing Woods, supra, 30 F.3d at 260).

"In this campaign, the *facts* that comprised plaintiff's prima facie case may be considered, but the inference of discrimination originally attributable to those facts no longer pertains." Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 720 (1st Cir. 1994).  In other words, "[t]he plaintiff may rely on the same evidence to prove both pretext and discrimination, but the

13

evidence must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by discriminatory animus."  Smith, supra, 40 F.3d at 16.  "To carry the devoir of persuasion on this ultimate issue, the plaintiff must identify probative evidence suggesting that the reason given by the employer for the employment action is pretextual, and, moreover, that it is a pretext for [] discrimination."  Sanchez, supra, 37 F.3d at 720 (footnote omitted).  See also Woods, supra, 30 F.3d at 260 (plaintiff cannot avert summary judgment at this stage "if the record is devoid of adequate direct or circumstantial evidence of discriminatory animus on the part of the employer").

The evidence plaintiff relies on to meet her burden of proving that Tech Prototype intentionally discriminated against her is largely duplicative of the evidence she relies on at the prima facie stage.  First, plaintiff asserts that Roger Somers knew about her pregnancy and her related medical problems when he discharged her on October 1, 1992.

Plaintiff states that she told Somers in June or July of 1992 about her ovarian cysts, and maintains that Somers knew then that she was going to require a disability leave at a future date for surgery.  Jeffrey Deposition at 45-46.  Plaintiff further states that she did not tell Somers about her pregnancy before he terminated her, but that rumors were flying "throughout the plant" that she was pregnant.  Id. at 47.  In addition, plaintiff

14

asserts that when she informed Somers that she was pregnant on October 1, "[h]is comment to me was that he knew I was pregnant and it didn't matter because pregnancy is a sickness, and sickness is no reason not to be terminated." Id.

With respect to his knowledge of plaintiff's medical conditions, Somers states that after he informed plaintiff of his decision to terminate her employment,

> she told me that she was pregnant. This was
> the first time that I had any knowledge that
> Cheryl was pregnant. . . . I had not known
> she was pregnant until after I made the
> decision to terminate her. I had known that
> she had ovarian cysts, although I did not
> know that they were possibly cancerous, but
> this fact played no part in my decision.

Somers Affidavit ¶¶ 8-9.

Construing this evidence in the light most favorable to plaintiff, the court assumes for the purposes of ruling on defendant's motion that Somers was aware that plaintiff was pregnant at the time he terminated her.

Plaintiff next asserts that she was well liked by her fellow employees and the customers with whom she worked,[5] and that she received four raises during the twenty-nine months she was employed at Tech Prototype, including a raise just four months

---

[5]Defendant concedes that Tsetseranos "was well liked within the company and by customers." Somers Affidavit ¶ 7.

before she was fired.[6]  Plaintiff maintains that these facts are inconsistent with defendant's contention that her job performance was unsatisfactory.

In addition, plaintiff points to the discussion she had with Somers a few days before she was fired as indicative of Somers' satisfaction with her job performance.  Plaintiff testified at her deposition that during this meeting "I explained to [Somers] that things were going well and the [Monday] report seemed to be on time . . . .  He asked if I started on my filing system, and I said, yes, and he asked me how far I got, and I started from A to C."  Jeffrey Deposition at 40.  Plaintiff further states that Somers "was satisfied with how everything was going.  Roger is a very upbeat kind of man, and he was very pleased."  Id.

Somers concedes that he met with plaintiff in late September "regarding the progress she had made in her filing and organization."  Somers Affidavit ¶ 5.  He states that at this meeting, "Cheryl told me that she had made improvements and had begun organizing her filing system.  I was pleased and hopeful that Cheryl was making the necessary strides to address the concerns I had."  Id.  However, Somers further states,

> The day after Cheryl told me about the
> improvement she had made, she was out from

---

[6]The court notes that plaintiff's fourth raise was effective the pay period ending June 6, 1992, which was prior to her June 8, 1992, evaluation.  See ADP Employee Earnings Record for Cheryl Tsetseranos.

16

> work. I went into her office to get some
> information and discovered that Cheryl's
> office was a mess and the filing system was
> no better organized than it had ever been. I
> concluded that she had lied to me about the
> changes she had made. The level of
> organization did not meet the level expected
> of her. In addition to Cheryl's
> organizational shortcomings, there had been
> complaints from co-workers about her response
> to them and her inability to find information
> that she was responsible for filing, as well
> as Cheryl's misquoting prices to customers
> and timely invoicing. There were also
> customer complaints regarding prices.

Id. ¶ 6. Based on these problems, Somers decided he "had no choice but to terminate her employment." Id. ¶ 7.

On December 3, 1992, Somers wrote a letter to plaintiff, at her request, reviewing the reasons for her dismissal. Somers explains in this letter that, despite the June 8 evaluation which indicated several areas for correction,

> Unfortunately, since that time no extra
> effort was made. Outwardly you tried to give
> the impression of corrective change, but no
> real substantial change took place. The
> company funded organizational skills seminar
> you took in July, you said, gave you many
> good ideas, but again no real change took
> place.

Letter from Somers to Tsetseranos (attached to Somers Affidavit as Exhibit D). Somers also states in the letter that,

> Since your dismissal, we have had the
> opportunity to investigate the customer
> service area more closely. There have been
> many hours spent correcting all the problems
> found. This has been documented in the
> copies of your personnel file you requested
> previously. These facts are what

17

precipitated your dismissal.

Id.

Further, Pamela Bodnar, the personnel manager at Tech Prototype, states in her affidavit that she helped "straighten out" plaintiff's office after plaintiff was terminated. The documentation attached to Bodnar's affidavit shows that four individuals, including Bodnar, worked off and on throughout the month of October in order to organize plaintiff's office and have it ready for someone else to step in to plaintiff's position. Affidavit of Pamela Bodnar ¶ 8 (attached to Defendant's Motion); Time Log (attached to Bodnar Affidavit as Exhibit B). Bodnar further states that she "discovered a number of pricing errors that Cheryl had made" while she was organizing plaintiff's office. Bodnar Affidavit ¶ 10. Finally, Bodnar states, "In all of my years working in an office environment, I have never seen a mess as bad as the mess in Cheryl's office." Id. ¶ 11.

Plaintiff asserts that much of the documentation in her personnel file about her job performance, such as that described hereinabove, is dated after her October 1 termination and is therefore not relevant to this court's analysis. However, defendant's post-termination documentation of the many hours plaintiff's co-workers spent organizing her office is consistent with defendant's pre-termination documentation of plaintiff's work performance problems. Accordingly, the court finds this

18

evidence to be relevant to the overall question of whether defendant intentionally discriminated against plaintiff.

Plaintiff also contends that the timing of her termination gives rise to an inference of discriminatory intent. Plaintiff was fired on October 1, 1992, after she had been out several days because of complications associated with her pregnancy. Plaintiff maintains that defendant knew when it fired her that she was going to rquire a disability leave in the near future for surgery. Further, shortly after plaintiff's termination, she was advised by her physician to stay out of work until further advised.

The court agrees that the timing of plaintiff's termination, standing alone, might support an inference of discriminatory intent. However, the court is not required to consider plaintiff's evidence on this issue in a vacuum. Here, plaintiff's evidence regarding the timing of her termination must be considered in conjunction with Pamela Bodnar's affidavit stating that plaintiff was paid disability benefits for approximately five and one-half months after her termination. Bodnar Affidavit ¶ 2. Bodnar further states, "[t]his disability compensation was the same compensation Cheryl would have received if she had not been terminated." Id.

After careful review and consideration of all the evidence presented by Tsetseranos, the court concludes that the evidence

19

is insufficient to allow a reasonable jury to find that defendant's stated reason for terminating plaintiff, poor job performance, was a pretext. The court further concludes that the evidence is insufficient to allow a reasonable jury to infer that discriminatory animus motivated defendant's decision to terminate Tsetseranos. Defendant's motion for summary judgment is therefore granted as to plaintiff's Title VII claim.

3.  Plaintiff's ADA Claim

Title I of the ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (Supp. 1995). A "qualified individual with a disability" is defined by the ADA to mean "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

In an employment discrimination claim brought under the ADA, the court's evaluation of the plaintiff's evidence follows a slightly modified version of the McDonnell Douglas framework. See, e.g., Braverman v. Penobscot Shoe Co., 859 F. Supp. 596, 603

20

(D. Me. 1994) (applying the <u>McDonnell Douglas</u> framework to an ADA claim for employment discrimination); <u>Sherman v. Optical Imaging Sys., Inc.</u>, 843 F. Supp. 1168, 1180-81 (E.D. Mich. 1994) (applying the "*prima facie* case/legitimate, non-discriminatory reason/pretext for discrimination analysis" to ADA claim for employment discrimination).

In order to make out a prima facie case of employment discrimination under the ADA, plaintiff must show that: (1) she was "disabled" as defined by the ADA; (2) she was qualified, with or without accommodation, to do her job as a customer service representative; (3) she was discharged; and (4) she was replaced by a nondisabled person. <u>Sherman</u>, <u>supra</u>, 843 F. Supp. at 1181.

Here, it is undisputed that plaintiff was pregnant and had ovarian cysts or tumors that were complicating her pregnancy at the time she was terminated. Plaintiff asserts that as a result of these conditions she was "disabled" under the ADA.

The term "disability" is defined under the ADA to mean

> with respect to an individual--
>     (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>     (B) a record of such an impairment; or
>     (C) being regarded as having such an impairment.

21

42 U.S.C. § 12102(2).[7]

The EEOC's "interpretive guidance" on Title I of the ADA states, with respect to the determination of whether an individual has a "physical or mental impairment," that "[i]t is important to distinguish between conditions that are impairments and physical, psychological, environmental, cultural and economic characteristics that are not impairments." 29 C.F.R. Pt. 1630, App. at 395 (1994). The regulations go on to state that "conditions, such as pregnancy, that are not the result of a physiological disorder are [] not impairments." Id. Further, "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities." Id. at 396.

Based on these regulations, the court concludes that pregnancy and related medical conditions do not, absent unusual circumstances, constitute a "physical impairment" under the ADA. Accordingly, pregnancy and related medical conditions are not "disabilities" as that term is defined by the ADA. The court finds this conclusion to be supported not only by the ADA's definition of disability and the EEOC's interpretive guidance on the ADA, but also by the fact that employment discrimination on

---

[7]"Major life activities" are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

22

the basis of pregnancy and related medical conditions is specifically covered by Title VII and the Pregnancy Discrimination Act.  Cf. Brennan v. National Tel. Directory Corp., 850 F. Supp. 331, 341-44 (E.D. Pa. 1994) (holding, under state laws modeled after Title VII and ADA, that pregnancy discrimination is discrimination on the basis of sex, not discrimination on the basis of a disability or handicap).  This coverage obviates the need for pregnancy-related discrimination to also be covered under the ADA.

Although plaintiff's pregnancy was clearly complicated by her ovarian cysts, and these complications required her to be out of work for a period of time, the court finds that plaintiff's pregnancy was not a "disability" under the ADA.  Further, even assuming that plaintiff's pregnancy and ovarian cyst problem constitute a disability under the ADA, the court finds, for the same reasons outlined in the court's analysis of plaintiff's Title VII claim, supra, part 2.c., that plaintiff has not produced sufficient evidence to establish a causal nexus between her disability and defendant's decision to terminate her.

Defendant's motion for summary judgment is accordingly granted as to plaintiff's ADA claim.[8]

---

[8]Having granted defendant's motion for summary judgment as to plaintiff's two federal claims, the court notes that it has the discretion to decline to exercise supplemental jurisdiction over plaintiff's state-law claims.  See 28 U.S.C. § 1367(c)(3)
(continued...)

4.  RSA 354-A Claim

Plaintiff seeks relief under RSA 354-A:7, which makes it unlawful for an employer to discriminate against an employee because of "pregnancy and medical conditions which result from pregnancy" or because of a physical disability.  RSA 354-A:7, I and VI (Supp. 1994).

RSA 354-A:7 is part of New Hampshire's "Law Against Discrimination."  See RSA 354-A:1.  The law establishes an administrative process through which a person claiming to be aggrieved by an unlawful discriminatory practice can seek relief.  See RSA 354-A:21 (describing complaint procedure).  Under the statute, a complainant must go through the administrative process and obtain an order or decision from the state's Human Rights Commission before she can seek judicial review.  In order to obtain judicial review of a commission order or decision, the complainant must file a petition "in the superior court of the state within any county in which the unlawful practice . . . occurs . . . ."  RSA 354-A:22, I.

The statutory provision on judicial review further provides,

> If the complainant brings an action in federal court arising out of the same claims of discrimination which formed the basis of an order or decision of the commission, such

---

[8](...continued)
(1993).  However, in light of the fact that discovery has been completed and this case stands ready for trial, the court will retain jurisdiction over the remaining state-law claims.

24

> order or decision shall be vacated and any
> appeal therefrom pending in any state court
> shall be dismissed.

RSA 354-A:22, V.

The court's review of the plain language of RSA 354-A leads the court to conclude that the statute does not create a private right of action for individuals aggrieved by unlawful discriminatory practices. Instead, under RSA 354-A, such individuals are limited to seeking relief through the administrative process created by the statute and to obtaining judicial review of the results thereof in state court. The court therefore concludes that it is without jurisdiction over any claim plaintiff has under RSA 354-A. Plaintiff's RSA 354-A claim is accordingly dismissed.

## 5.  Plaintiff's Wrongful Discharge Claim

In Count IV of her complaint, plaintiff alleges that her discharge was motivated by bad faith, malice, and retaliation because plaintiff sought benefits and leave due to her disability and pregnancy. Plaintiff further alleges that her actions were ones that public policy supports and condones.

In order to maintain a wrongful discharge claim under New Hampshire law, a plaintiff must establish two elements:

> one, that the employer terminated the
> employment out of bad faith, malice, or
> retaliation; and two, that the employer
> terminated the employment because the

25

employee performed acts which public policy would encourage or because he refused to perform acts which public policy would condemn.

Short v. School Admin. Unit No. 16, 136 N.H. 76, 84, 612 A.2d 364, 370 (1992) (citing Cloutier v. A & P Tea Co., Inc., 121 N.H. 915, 921-22, 436 A.2d 1140, 1143-44 (1981)).

With respect to the first element, plaintiff submits evidence showing that defendant knew she required disability leave due to her pregnancy and ovarian cysts at the time she was discharged. Plaintiff submits that in July or August of 1992, in order to ascertain the scope of her medical coverage, she informed Pamela Bodnar that she was pregnant and had ovarian tumors or cysts that were potentially cancerous. Jeffrey Affidavit ¶ 3; Jeffrey Deposition at 35.

Bodnar states in her affidavit that "Cheryl told me in September, 1992 that she may have to go out on disability leave because of possible problems with her cysts and complications that might affect her pregnancy." Affidavit of Pamela Bodnar ¶ 2 (attached to Defendant's Motion). Bodnar also testified at her deposition that Roger Somers had communicated to her in the spring of 1992 "[t]hat Cheryl was going to have to go on medical leave, and he wasn't certain the amount of time she was going to be out, but we would have to get coverage [for her work]." Deposition of Pamela J. Bodnar at 19 (attached to Plaintiff's Objection).

26

On Tuesday, September 29, 1992, plaintiff left work to go to a doctor's appointment she had scheduled because she was feeling "very ill." Jeffrey Affidavit ¶ 7. After her examination, plaintiff's doctor advised her "to stay out of work and at bedrest for two (2) days." Letter from Thomas J. Barrett, M.D., dated September 29, 1992 (attached to Jeffrey Affidavit as Exhibit B). Plaintiff called Pamela Bodnar on Wednesday, September 30, to inform her that she would be out of work until Friday, October 2. Jeffrey Affidavit ¶ 8. Plaintiff also informed Bodnar that she "would be bringing in a doctor's note to that effect on Thursday, October 1, 1992." Id.

Plaintiff was terminated by Roger Somers on October 1, 1992. Less than two weeks after her termination, plaintiff received a note from her physician stating, "Cheryl Tsetseranos is a patient in this office. She is pregnant and due for delivery on February 13, 1993. Cheryl has been advised to stay out of work and at rest until further advised. If you have any questions, please feel free to contact our office at your convenience." Letter from Thomas J. Antisdel, M.D., dated October 12, 1992 (attached to Jeffrey Affidavit as Exhibit B).

According to Bodnar, "After Cheryl's termination, she was paid disability benefits for approximately five and one-half (5 1/2) months. This disability compensation was the same compensation Cheryl would have received if she had not been

27

terminated." Bodnar Affidavit ¶ 5.

Tsetseranos asserts that her termination was motivated by bad faith, malice, and retaliation because she sought medical benefits and leave due to her disability and pregnancy. However, plaintiff received the same disability benefits from defendant following her discharge as she would have received if she had not been terminated.

Under these circumstances, the court concludes that no reasonable jury could find that defendant terminated plaintiff out of bad faith or malice, or in retaliation for her seeking medical benefits and disability leave. Defendant's motion for summary judgment is therefore granted as to plaintiff's wrongful discharge claim.

## Conclusion

For the reasons set forth herein, defendant's motion for summary judgment (document 13) is granted, and defendant's motion to amend its answer (document 18) is denied as moot. The clerk's office shall enter judgment accordingly.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

April 10, 1995

cc: Robert E. Jauron, Esq.
    Randall E. Wilbert, Esq.

28