United States Court of Appeals United States Court of Appeals
 For the First Circuit For the First Circuit
 

No. 94-1931

 UDO U. UDO,

 Plaintiff, Appellant,

 v.

 HENRY TOMES, COMMISSIONER FOR THE
 DEPARTMENT OF MENTAL HEALTH,

 Defendant, Appellee.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Joseph L. Tauro, U.S. District Judge] 

 

 Before

 Torruella, Chief Judge, 
 Aldrich, Senior Circuit Judge, 
 and Stahl, Circuit Judge. 

 

John A. Birknes, Jr., for appellant. 
Deborah S. Steenland, Assistant Attorney General, with whom Scott 
Harshbarger, Attorney General, was on brief for appellee. 

 

 April 28, 1995
 

 STAHL, Circuit Judge. Plaintiff-appellant Dr. Udo STAHL, Circuit Judge. 

U. Udo challenges his layoff from Taunton State Hospital

("Taunton"), which is operated by the Massachusetts

Department of Mental Health ("DMH"). Udo claims that DMH

laid him off because of age discrimination in violation of

the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.

 626(b), and race discrimination in violation of Title VII

of the Civil Rights Act of 1964, 42 U.S.C. 2000(e). Udo

also claims that defendant-appellee Henry Tomes, the

Commissioner of DMH, in his individual capacity deprived him

of his civil rights in violation of 42 U.S.C. 1983. The

district court granted summary judgment to defendant, and Udo

appeals. We affirm.

 I. I. 

 Background Background 

 In October 1990, the Massachusetts state

legislature directed all state agencies, including DMH, to

implement cost-saving measures to address underfunding in the

Fiscal Year 1991 budget. DMH responded to this fiscal

emergency with a plan that included significant staff

reductions. In connection with its state-wide reduction in

force, DMH eliminated the two Physician II positions at

Taunton, one of which Udo held. At that time, DMH employed a

total of nineteen Physician IIs in its various hospitals. Of

those, Udo had the most seniority, having been employed since

 -2- 2

1975. Udo was also the only Black and, at sixty-five, the

oldest of the nineteen Physician IIs employed by DMH.

 Tomes notified Udo by letter dated October 12,

1990, that his position at Taunton had been eliminated. In

the letter, in accordance with procedures under which senior

employees whose positions are eliminated can "bump" less

senior employees, Tomes offered Udo certain bumping options.

Tomes also notified Udo that he could request an exit

interview with the DMH Equal Employment/Affirmative Action

Office to determine if any affirmative action rights had been

abridged. Although Udo requested such an interview, no

interview was ever conducted. Udo elected to bump into the

Physician II position at Metropolitan State Hospital, and, on

October 26, 1990, Tomes sent Udo a letter indicating that he

had been awarded that position.

 After awarding Udo the Physician II position at

Metropolitan State Hospital, DMH became aware that, as a

result of a disciplinary action for malpractice, the

Massachusetts Board of Registration in Medicine had, on

October 17, 1990, restricted Udo's license to practice

medicine to Taunton. Consequently, in a letter dated

November 6, 1990, Tomes informed Udo, "Since your election to

practice medicine at Metropolitan State Hospital is contrary

to this disciplinary action, you are hereby laid-off

effective November 17, 1990."

 -3- 3

 Udo, a member of the Massachusetts Nurses

Association ("MNA"), challenged the elimination of his

position and his layoff through the grievance process set out

in the union's collective bargaining agreement, arguing that

those actions violated the collective bargaining agreement

and that they were discriminatory in terms of both age and

race.1 The arbitrator found that Udo's layoff violated

seniority provisions of the collective bargaining agreement

and held that the "decision to lay off [Udo] was arbitrary,

capricious and unreasonable and in violation of the

contract."2 The arbitrator did not consider Udo's

discrimination claims.

 In April 1992, before his arbitration case was

concluded, Udo became aware that Taunton had advertised a

Physician II position with a posting date of April 16, 1992,

and a closing date of April 24, 1992. On May 8, 1992, the

MNA notified Taunton that Udo was eligible to be recalled to

that position through the collective bargaining agreement, as

  

1. The MNA also pursued an action with the Massachusetts
Labor Relations Commission against DMH on behalf of all MNA
members who had been laid off or bumped (including Udo)
during the state-wide reduction in force, and the
Massachusetts Labor Relations Commission found that DMH had
violated the collective bargaining agreement.

2. The arbitrator rendered his decision on December 20,
1992, giving the parties ninety days to reach a settlement
regarding relief. Because the parties were unable to agree,
on June 11, 1993, the arbitrator ordered that Udo be
reinstated to his position at Taunton and that he receive
partial back pay.

 -4- 4

the agreement provides for recall following layoff at any

time within two years. DMH responded that it had rescinded

that announcement and that the position was no longer

available. Udo later found out that the position had been

filled by an "03" physician. An 03 physician has the same

duties as a Physician II, but does not come within the

collective bargaining agreement.

 In addition to challenging the elimination of his

position and his layoff through his union, Udo filed the

instant action. The district court granted defendant's

motion for summary judgment, and Udo appeals.

 II. II. 

 Discussion Discussion 

A. Standard of Review 

 As always, we review a district court's grant of

summary judgment de novo and, like the district court, review 

the facts in the light most favorable to the nonmoving party.

See, e.g., Lareau v. Page, 39 F.3d 384, 387 (1st Cir. 1994). 

Summary judgment is appropriate when "the pleadings,

depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c).

 -5- 5

B. Age and Race Discrimination 

 1. The Legal Framework 

 In disparate-treatment cases, plaintiffs bear the

ultimate burden of proving that they were the victims of

intentional discrimination. St. Mary's Honor Ctr. v. Hicks, 

113 S. Ct. 2742, 2747-48 (1993). When plaintiffs are unable

to offer direct proof of their employers' discriminatory

animus -- as is usually the case and was so here -- we

allocate the burden of producing evidence according to the

now-familiar three-step framework set forth in McDonnell 

Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). See, 

e.g., Hicks, 113 S. Ct. at 2746 (race discrimination); 

LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 

1993) (age discrimination), cert. denied, 114 S. Ct. 1398 

(1994).

 Under the McDonnell Douglas framework, plaintiffs 

bear the initial burden of establishing a prima facie case of

discrimination. McDonnell Douglas, 411 U.S. at 802. In 

reduction-in-force cases, the plaintiff establishes the prima

facie case by demonstrating that he or she (1) was a member

of a protected class, (2) met the employer's legitimate job-

performance expectations, (3) was laid off, and (4) that the

employer either did not treat members of the protected class

neutrally or retained persons not within the protected class

in the same position. See LeBlanc, 6 F.3d at 842. 

 -6- 6

 Once the plaintiff establishes a prima facie case,

a presumption arises that the employer unlawfully

discriminated against the plaintiff. Hicks, 113 S. Ct. at 

2747; LeBlanc, 6 F.3d at 842. This presumption "places upon 

the defendant the burden of producing an explanation to rebut

the prima facie case -- i.e., the burden of `producing

evidence' that the adverse employment actions were taken `for

a legitimate, nondiscriminatory reason.'" Hicks, 113 S. Ct. 

at 2747 (quoting Texas Dept. of Community Affairs v. Burdine, 

450 U.S. 248, 254 (1981)). While the burden of production

shifts to the defendant during this second step, the burden

of persuasion remains on the plaintiff. Hicks, 113 S. Ct. at 

2747.

 If the defendant "articulate[s] some legitimate,

nondiscriminatory reason for the plaintiff's [layoff],"

McDonnell Douglas, 411 U.S. at 802, then the presumption of 

discrimination established by the plaintiff's prima facie

showing "drops out of the picture." Hicks, 113 S. Ct. at 

2749. The burden of production then shifts back to the

plaintiff, who is given an opportunity to show that the

defendant's stated reason for laying off the plaintiff was a

pretext for discrimination. See McDonnell Douglas, 411 U.S. 

at 804. "The defendant's `production' (whatever its

persuasive effect) having been made, the trier of fact

proceeds to decide the ultimate question: whether plaintiff

 -7- 7

has proven `that the defendant intentionally discriminated

against [him].'" Hicks, 113 S. Ct. at 2749 (quoting Burdine, 

450 U.S. at 253) (alterations in Hicks); see also LeBlanc, 6 

F.3d at 843 (applying Hicks to age discrimination cases). 

Thus, once the employer articulates a legitimate,

nondiscriminatory reason for laying off the plaintiff, to

avoid summary judgment, the plaintiff must introduce

sufficient evidence to support two findings: (1) that the

employer's articulated reason for laying off the plaintiff is

a pretext, and (2) that the true reason is discriminatory.

Smith v. Stratus Computer, Inc., 40 F.3d 11, 16 (1st Cir. 

1994), petition for cert. filed, 63 U.S.L.W. 3644 (U.S. Feb. 

21, 1995) (No. 94-1416). While the plaintiff may rely on the

same evidence to prove both pretext and discrimination, the

evidence must be sufficient for a reasonable factfinder to

infer that the employer's decision was motivated by

discriminatory animus. Id. 

 2. Application 

 We shall assume, as the district court did, that

Udo established a prima facie case under the McDonnell 

Douglas formulation for both age and race discrimination. As 

its reason for laying Udo off, DMH points to the restriction

on Udo's medical license that made it impossible for him to

 -8- 8

bump to another hospital.3 This reason satisfies DMH's

burden of production and shifts the burden back to Udo to

prove that DMH's proffered reason is a pretext for

discrimination.

 Even assuming arguendo that DMH's immediate seizure 

on the restriction on Udo's license was a pretext for some

other reason,4 in order to survive a motion for summary

judgment, Udo's evidence must also allow a jury to find that

DMH's articulated reason was a pretext for discrimination. 

See Smith, 40 F.3d at 16 ("Title VII does not grant relief to 

a plaintiff who has been discharged unfairly, even by the

  

3. The exact language of the restriction placed on Udo's
license is as follows:
 The Respondent [Udo] will restrict his
 current practice of medicine to Taunton
 State Hospital and its affiliate programs
 where he currently practices, or to those 
 hospitals and their affiliates who are 
 approved by the Board in advance, and 
 such practice will be monitored by a
 Board-approved monitoring physician who
 will report to the Board, on a regular
 basis, the Respondent's activity and
 quality of patient care rendered by him.
(emphasis added).
 Although the Board imposed this restriction on
Udo's medical license on October 17, 1990, it stemmed from
malpractice occurring before 1980 at St. Luke's Hospital. At
Udo's request, on November 28, 1990, the Board changed the
restriction to allow Udo to practice at other hospitals and
clinics under the jurisdiction of DMH.

4. We note that the arbitrator found Udo's layoff to be
"arbitrary, capricious or unreasonable and in violation of
the contract." While we, of course, are not bound by the
arbitrator's findings, Alexander v. Gardner-Denver Co., 415 
U.S. 36, 59-60 (1974), the arbitrator's decision could be
considered some evidence of pretext.

 -9- 9

most irrational of managers, unless the facts and

circumstances indicate that discriminatory animus was the

reason for the decision.").

 To establish that he was the victim of race

discrimination, Udo presents an MNA document that shows that

the nineteen Physician IIs employed by DMH at the time he was

laid off comprised eleven Caucasians, six Asians, one

Hispanic, and one Black (Udo). Based on this document, Udo

maintains that DMH retained all eleven Caucasians, but that

it laid off the only Black (Udo), the only Hispanic, and two

of the six Asians. DMH responds with the affidavit of Jeff

McCue, DMH's Assistant Commissioner for Human Resources.

According to McCue, DMH eliminated only two Physician II

positions, not four, namely the two positions at Taunton.

McCue explains that because neither Udo nor Dr. Pandya, an

Asian who held the other Taunton Physician II position,

exercised their bumping options, neither of the two least

senior Physician IIs, who happened to be a Hispanic and an

Asian, were laid off.

 Udo also argues that DMH's failure to conduct his

requested exit interview to determine whether affirmative

action rights pertaining to him were being abridged evidences

DMH's discriminatory animus. DMH states that no exit

interview was conducted because Udo asked Richard C.

Haddocks, Jr., the Director of Human Resources at Taunton,

 -10- 10

for an exit interview on October 18, 1990, but Haddocks took

a medical leave of absence beginning on October 21, 1990,

prior to taking action on Udo's request, and did not return

to work until after Udo had been laid off.5

 As evidence of age discrimination, Udo notes that

in June 1990, Haddocks sent him a letter stating that he

would have to retire since he turned sixty-five that month.

After Udo informed him that he was mistaken and that

retirement was not required until age seventy, Haddocks

checked further into the matter and informed Udo that he was

correct. In his affidavit submitted with defendant's summary

judgment motion, Haddocks stated that he wrote the retirement

letter because he had received incorrect information from the

  

5. Udo also notes that "the affirmative action plan of DMH
specifically provides that any layoff action by DMH must be
reviewed by the EEO Administrator before it becomes final to
determine if such action represents a breakdown in the
affirmative action program and therefore calls for remedial
action." DMH responds that "[t]he EEO Administrator did in
fact review the plan for staff reductions prior to its
implementation." Thus, DMH claims that while Udo failed to
receive his exit interview, the EEO Administrator had still
reviewed his layoff. 
 Udo points out, however, that the most DMH did was
initially review the reduction in force "prior to its
implementation," but that this included only the elimination
of Udo's Taunton position and not his actual layoff. Udo
seems to cite this as evidence that "the layoff should never
[have] become final," rather than as evidence of age or race
discrimination. While this evidence may constitute proof
that DMH violated the collective bargaining agreement, we do
not think that it tends to prove that Udo was laid off as the
result of age or race discrimination.

 -11- 11

Massachusetts State Board of Retirement that Udo was subject

to mandatory retirement at age sixty-five.

 As evidence of both age and race discrimination,

Udo also points to DMH's behavior after he applied for a

Physician II position at Taunton that was advertised by DMH

in April 1992. DMH allegedly responded to Udo's application

by stating that the announcement and position had been

rescinded, but then later hired an "03" contract physician to

fill the position.

 We do not think that, given this evidence, a

rational jury would be able to find that DMH discriminated

against Udo because of his age or his race. That DMH

eliminated two positions, which were occupied by a Black and

an Asian, does not show that DMH was improperly motivated by

age or race when it subsequently laid Udo off. See Lawrence 

v. Northrop Corp., 980 F.2d 66, 74 n.13 (1st Cir. 1992) ("Nor 

can the fact that the three oldest associate program managers

in Organization 4000 were targeted for layoff itself be

viewed as giving rise to an inference of age

discrimination."). Similarly, we have trouble understanding

how DMH's failure to conduct an exit interview prior to

laying Udo off shows that the decision to lay him off was

discriminatory in motive. Nor do we think that the

retirement letter Udo received shows age animus on the part

of DMH; rather, it seems merely to show that the

 -12- 12

Massachusetts State Board of Retirement sent DMH incorrect

information. Cf. Mesnick v. General Elec. Co., 950 F.2d 816, 

826 (1st Cir. 1991) ("the intentions of a third party may not

be attributed to an employer without some rational basis for

attribution"), cert. denied, 112 S. Ct. 2965 (1992). 

 We focus in particular on the fact that Udo was not

recalled to his position at Taunton. While this tends to

indicate that DMH did not want to rehire him, and thus

supports the inference that the restriction on his license

may have been a pretext, it does not by itself provide a

basis for inferring age or race discrimination. That DMH may

have violated the collective bargaining agreement yet again

when it failed to recall Udo does not indicate that DMH is

thereby also liable under Title VII or the ADEA.

 Because Udo has not presented evidence that would

enable a rational jury to find that he was laid off because

of age or race discrimination, we hold that DMH was entitled

to summary judgment on Udo's age and race discrimination

claims.

C. Section 1983 

 Udo also sued Tomes in his individual capacity,

claiming that Tomes violated his civil rights by depriving

him of employment through an unlawful layoff based on his

race, in violation of 42 U.S.C. 1983. Because, as we held

above, Udo failed to raise a triable issue as to whether his

 -13- 13

layoff was motivated by discriminatory intent, the district

court properly granted Tomes summary judgment on this claim.

 -14- 14

 III. III. 

 Conclusion Conclusion 

 We hold that Udo failed to create a genuine issue

of triable fact on his age and race discrimination claims,

and therefore also on his 1983 claim. Accordingly,

defendant was entitled to summary judgment. The judgment of

the district court is therefore

 Affirmed. 

 -15- 15