ASI Worldwide v. MCI WorldCom          CV-98-154-B    03/29/02

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>A.S.I. Worldwide</u>
<u>Communications Corp.</u>

    **v.**                                      Civil No. 98-154-B
                                           Opinion NO. 2002 DNH 076
<u>MCI WorldCom Network</u>
<u>Services, Inc.</u>


<u>**MEMORANDUM AND ORDER**</u>


In 1994, a predecessor of defendant WorldCom Network Services, Inc. agreed to provide long distance telephone services to plaintiff ASI Worldwide Communications Corporation for resale to the public.  ASI did not intend to file tariffs with the Federal Communications Commission ("FCC") or take other measures required by federal and state law to sell the long distance services itself.  Instead, it planned to identify end users for the long distance services through marketing efforts and contract with an authorized reseller to service the end users.

ASI's relationship with WorldCom was plagued by difficulty from the outset.  ASI claims that WorldCom repeatedly violated

the tariff under which it was providing the long distance services by overcharging ASI and failing to provide it with accounting information. ASI also asserts that WorldCom improperly transferred end users controlled by ASI to WorldCom's own account, a process known as "slamming." ASI's concerns eventually prompted it to terminate its agreement with WorldCom and file this action asserting claims for interference with its contractual relationships (Count I), conversion (Count II), violations of New Hampshire's Consumer Protection Act, N.H. Rev. Stat. Ann. 358-A (Count III), and violations of various provisions of the Federal Communications Act ("FCA"), 47 U.S.C. §§ 151 et seq. (Counts IV-VIII).

WorldCom has responded with a motion for summary judgment. It argues that ASI's slamming claims are defective because ASI lacked a proprietary interest in its end users. WorldCom also contends that ASI engaged in a pattern of illegality in its dealings with its end users that prevents it from maintaining its current claims. Finally, it argues that ASI cannot support its claims with enough evidence to warrant a trial.

# I.  BACKGROUND[1]

In March 1994, WilTel, Inc., WorldCom's predecessor, entered into a contract to provide ASI with its "WilPlus III" long distance telephone services for a period of three years.  The parties' business relationship, including the rates, terms and conditions under which the services were to be provided, was governed by a tariff WilTel filed with the FCC.  ASI promised to generate at least $100,000 in monthly long distance call volume and furnish WilTel with certain letters of credit in exchange for WilTel providing ASI with a 40% discount on the WilPlus III three-year base rates set in its tariff.  The contract entitled ASI to an even more favorable rate if it generated more than $200,000 in monthly call volume.

ASI and WilTel entered into an addendum to the contract in May 1995, wherein (1) ASI agreed to generate at least $350,000 in monthly long distance call volume or to pay that amount as a minimum monthly charge if it failed to achieve that volume; (2)

---

[1] I construe the evidence in the light most favorable to ASI, the non-moving party, and draw all reasonable inferences in its favor.  See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001) (explaining the operation of Fed. R. Civ. P. 56) (citation omitted).

ASI agreed to furnish WilTel with certain cash security deposits and/or letters of credit; (3) WilTel agreed to provide ASI with a 40% discount on the WilPlus III three-year base rates set in the applicable tariff; and (4) WilTel promised to provide ASI with an annual credit equivalent in value to one month of free long distance usage. In or around 1995, WorldCom acquired WilTel and assumed WilTel's obligations under the agreements with ASI.

ASI developed end users for the services it acquired from WorldCom through marketing efforts. It did not, however, file its own tarriffs with the FCC and take other actions that were required to become an authorized reseller. Instead, it contracted with TWC Communications, Inc. ("TWC"), an authorized reseller, to serve the end users listed on ASI's WorldCom account. ASI retained control over the accounts it generated by having customers sign Letters of Agency, authorizing ASI to place their service with TWC. When ASI ordered service for its end users, it provided WorldCom with the customer's name, contact telephone number, and the address where the service was to be installed. Pursuant to ASI's agreement with WorldCom, WorldCom provided ASI with a record of calls made by customers listed on

ASI's account.  ASI, in turn, sent the record to TWC.  TWC generated the bills for each customer on ASI's account and customers were instructed to send their payments to TWC.

TWC terminated its relationship with ASI in November 1996, leaving ASI without an authorized reseller to service its customer base.  As a temporary arrangement, TWC agreed to continue billing end users on ASI's account through December 1996.  ASI then entered into an agreement with CCC Communications Corporation ("CCC"), whom ASI understood was planning to acquire TWC.  CCC allowed ASI to bill end users on ASI's WorldCom account using TWC's tariffs and certifications through February 1997.

In May 1997, ASI contracted with another certified reseller, WorldTel Services, Inc. ("WorldTel").  Under its agreement with WorldTel, ASI billed the end users on its WorldCom account in accordance with WorldTel's filed tariffs.  In return, ASI paid WorldTel the greater of 1% of billed revenues from its end users' telecommunications usage or $5,000 per month.  The parties agreed that the contract would operate retroactively, beginning with the March 1997 billing period.  ASI then billed its customers for March, April, and subsequent months using WorldTel's tariffs.

During its business relationship with WorldTel, ASI funded an escrow account from which taxes associated with the telecommunications services provided were paid. ASI sent its end users bills which reflected charges for service provided by WorldTel in conjunction with ASI. ASI also handled all customer service issues that arose throughout its relationship with WorldTel. ASI did not obtain authorization from any of its customers before moving them from TWC to WorldTel.

ASI made hundreds of requests throughout its relationship with WorldCom for accountings of charges that it believed were erroneous. WorldCom either ignored ASI's requests, or instructed ASI to pursue a lengthy, bureaucratic process to obtain credits. ASI alleges that it could take months or years for credits to be applied to ASI's account, and that even after bills were corrected, WorldCom would reinstitute the erroneous charges on later bills, thus causing ASI to repeat the burdensome process of pursuing credits.

Frustrated with the process of applying for credits, ASI at times engaged in self-help by withholding payments to WorldCom in amounts equal to its overcharges. It communicated its reasons

for withholding payments both to WorldCom executives and line employees responsible for ASI's account. In December 1996, WorldCom responded to ASI's decision to withhold payments by seizing a portion of ASI's security deposit. Six months later, WorldCom issued ASI credits worth approximately the amount that it had seized from the security deposit.

ASI attempted to end its business relationship with WorldCom at the end of 1996. ASI requested an accounting in order to enable the transfer of its end users from WorldCom's facilities. WorldCom agreed to, but never performed, the accounting.

Over the next two years, WorldCom not only failed to provide the requested accounting but also (1) continued to withhold credits; (2) failed to provide ASI with "Lost ANI Listings for Non-Rebillers" - daily reports of customers that had been removed from ASI's account; (3) put ASI on a "credit hold," locking its account, not allowing the addition of any new phone lines, and barring ASI's end user customers from adding or making changes to their long distance service; (4) transferred end users from ASI's account to WorldCom's "casual call" program, without authorization from either ASI or the end user; (5) told some of

ASI's end users who called to complain about the switch to the "casual call" program that ASI had gone out of business and could no longer handle the customer's account; (6) "split" ASI's account between two billing systems, and lost or confiscated a substantial portion of ASI's customers in the process; (7) transferred onto ASI's account ANI's that had earlier elected to move off ASI's account in favor of another long distance provider; (8) following the split, failed to adhere to its agreement with ASI to provide ASI a detailed breakdown of calls for nearly 50% of the charges it billed ASI; and (9) breached its agreement with ASI by increasing ASI's "non-usage charges," which should have been decreasing in proportion with ASI's diminishing customer base.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue is one "that properly can be resolved

-8-

only by a finder of fact because [it] may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A material fact is one that affects the outcome of the suit. See id. at 248.

In ruling on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-movant. See Navarro, 261 F.3d at 94 (citation omitted). The party moving for summary judgment, however, "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion, the burden shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996) (citing Celotex, 477 U.S. at 323; Anderson, 477 U.S. at 249). While courts must exercise restraint in granting summary judgment in

cases where the nonmoving party must prove "elusive concepts such as motive or intent. . . summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Smith v. Stratus Computer, Inc., 40 F.3d 11, 13 (1st Cir. 1994) (citation and internal quotation marks omitted). I apply this standard in resolving WorldCom's motion for summary judgment.


## III.  DISCUSSION

ASI's claims against WorldCom fall into two broad categories:  claims that WorldCom improperly slammed end users from accounts controlled by ASI to its own account, and claims that WorldCom violated its contract with ASI and the tariff under which the contract was issued by overcharging for its services and failing to provide ASI with accurate accounting information. WorldCom challenges ASI's slamming claims by contending that ASI cannot sue for slamming because it lacks a proprietary interest in the slammed end users.  WorldCom challenges the remaining claims by contending that ASI's contract with WorldCom is unenforceable because after TWC terminated its relationship with

ASI, ASI provided long distance services directly to its end users without complying with federal and state regulatory requirements.  Finally, WorldCom argues that ASI has failed to support its claims with enough evidence to entitle it to a trial. I address each argument in turn.

### A.   <u>ASI's Slamming Claims</u>

ASI concedes that it could not lawfully provide long distance services directly to the public because it did not file tariffs with the FCC and comply with various regulatory requirements.  <u>See</u> 47 U.S.C. § 203; <u>see also</u> <u>Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities</u>, 60 F.C.C.2d 261, ¶ 8 (July 16, 1976); <u>AT&T Co. v. FCC</u>, 572 F.2d 17, 24-25 (2d Cir. 1978) (resellers are subject to FCA).  It also has failed to demonstrate either that it had a contractual relationship with any of the slammed end users or that it had a property interest in ensuring that they continued to purchase their long distance services from a particular carrier.  Nevertheless, ASI argues that it can sue for slamming based on 47 U.S.C. § 258 (Count VIII), 47 U.S.C. § 222 (Count VII), the state common law torts of interference with contractual

relationships (Count I) and conversion (Count II), and New Hampshire's Consumer Protection Act, N.H. Rev. Stat. Ann. 358-A (Count III). I reject these arguments.

### 1. 47 U.S.C. § 258

Section 258 provides that if a carrier engages in slamming, it shall be liable to "the carrier previously selected by the subscriber." 47 U.S.C. § 258(b). ASI concedes the fact that it was never a carrier. Thus, it cannot maintain a claim under § 258.

### 2. 47 U.S.C. § 222

Section 222 requires telecommunications carriers "to protect the confidentiality of proprietary information of, and relating to, other telecommunications carriers, equipment manufacturers, and customers, including telecommunication carriers reselling telecommunications services provided by a telecommunications carrier." 47 U.S.C. § 222(a). ASI claims that it was a "customer" within the meaning of § 222, and therefore it has an actionable claim against WorldCom for misusing proprietary information concerning its end users to slam them onto WorldCom's account.

Even if I assume for purposes of analysis both that ASI was WorldCom's "customer" and that WorldCom misused "customer proprietary network information"[2] when it allegedly slammed ASI's end users onto its account, ASI's § 222 claim fails for essentially the same reason that it cannot maintain a claim under § 258. Because ASI did not serve as a carrier for any of the slammed end users, it cannot recover damages that the carrier for the end users may have suffered when the end users were improperly transferred onto WorldCom's account. Moreover, ASI has not established that it had a right to otherwise exploit the customer proprietary network information it obtained from end users. This information belonged to the end users and the carrier who serviced them rather than to ASI. Thus, only the end

---

[2] Customer proprietary network information is:
(A) information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications serice subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and
(B) information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier . . . .
47 U.S.C. § 222(h)(1).

users or a carrier servicing the end users could have suffered a compensable injury as a result of WorldCom's alleged violation of § 222.

### 3. Tortious Interference

To prove a tortious interference claim under New Hampshire law, ASI must prove that it had a contractual relationship with its end users, that WorldCom knew of the contractual relationship, and that WorldCom wrongly caused end users to breach their contracts with ASI. See Nat'l Employment Serv. Corp. v. Olsten Staffing Serv., Inc., 145 N.H. 158, 162 (2000). This claim fails for the simple reason that ASI never had a contractual relationship with any of its end users. Instead, the end users contracted with TWC to provide them with long distance services pursuant to the terms of its tariffs.[3] Thus, only TWC or the end users themselves could maintain a claim for tortious interference based on WorldCom's alleged slamming.

---

[3] The parties disagree as to whether WorldTel ever had an enforceable contract with any of the end users after TWC terminated its relationship with ASI. This dispute does not affect ASI's tortious interference claim, however, because it does not change the undisputed fact that ASI never had an enforceable contract with the end users.

### 4. Conversion

To successfully assert a claim for conversion, ASI must establish that it had a right to possess the property in question. See Marcucci v. Hardy, 65 F.3d 986, 991 (1st Cir. 1995) ("The right to possession is a key element which the claimant must establish.") (citing Rinden v. Hicks, 119 N.H. 811 (1979); McGranahan v. Dahar, 119 N.H. 758 (1979)). At no point in time did ASI have a legally protected property interest in either the slammed end users themselves or in the information ASI collected concerning them. See supra III. A. 2. Without this crucial element, ASI's conversion claim fails as a matter of law.

### 5. Consumer Protection Act

Finally, ASI has brought a claim under the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. 358-A. This claim, which is again based on WorldCom's slamming of end users, is merely a statutory version of ASI's common law conversion claim, and fails for the reasons stated above.

## B. Tariff Claims

### 1. ASI's failure to comply with regulatory requirements

ASI also asserts claims against WorldCom under the FCA for

excessive billing and failing to provide accounting information (Counts IV, V and VI). These claims do not depend upon ASI's relationship with its end users, and therefore the claims are not precluded simply because ASI lacked a contractual relationship or a property interest in the end users. Nevertheless, WorldCom argues that these claims also fail because ASI's alleged failure to comply with various aspects of the FCA and analogous state regulatory requirements renders its agreement with WorldCom unenforceable.

WorldCom does not challenge ASI's contention that it complied with all regulatory requirements during the period that TWC served as the authorized carrier for ASI's end users. Once TWC terminated its contract with ASI, however, WorldCom alleges that ASI failed to comply with a number of state and federal regulatory requirements by: (1) providing interstate telecommunications services directly to end users without having filed tariffs with the FCC as required by 47 U.S.C. § 203;[4] (2)

_____

[4]  ASI contends that end users were billed under tariffs filed by TWC until February 1997 and that thereafter end users were billed appropriately using WorldTel's tariffs. WorldCom argues that ASI's right to rely on TWC's tariffs lapsed in December 1996, that from December 1996 until May 1997, ASI provided long distance services directly to end users without

-16-

providing international long distance services to end users without obtaining permission from the FCC under 47 U.S.C. § 214 as required by 47 C.F.R. § 63.18 (effective in May 1996, see 61 F.R. 15729 (Apr. 9, 1996)); (3) failing to file forms and pay regulatory assessments required by the FCC;[5] (4) failing to

_____

complying with state and federal regulatory requirements, and that ASI's later "partnership" with WorldTel was a meaningless sham.  I need not determine whether WorldCom's arguments are correct as a matter of law because I would reject its summary judgment motion even if the undisputed facts demonstrated that its assertions were true.

[5]  During the time period when ASI allegedly was not partnered with an authorized reseller (December 1996 to May 1997), the FCC required resellers to file Form 431, from which the FCC assessed carrier contributions to the Telecommunications Relay Services Fund, which makes telecommunications services available to individuals with hearing and speech disabilities, see 47 U.S.C. § 225; 47 C.F.R. § 64.604(c)(5)(iii) (Telecommunications Relay Services Fund effective July 26, 1993). Subsequently, when ASI was partnered with WorldTel, the FCC also required a carrier to file: (1) Form 457 (approved by OMB on July 31, 1997, see FCC Announces Release of Universal Service Worksheet, 12 F.C.C. Rcd. 11676 (Aug. 4, 1997)), from which the FCC assessed carrier contributions to the Universal Service Fund, which ensures access to telecommunications services at reasonable prices for consumers in high cost service areas, see 47 U.S.C. § 254(d); (2) Form 496, created by the FCC in 1998 to assess carrier contributions to the North American Numbering Plan, which ensures that all carriers have access to phone numbers for their customers on a competitively neutral basis, see 47 U.S.C. § 251(e); 47 C.F.R. § 52.17; and (3) Form 487, created by the FCC in 1998 to assess carrier contributions to the Local Number Portability Program, which ensures that customers can move from one local telephone carrier to another while retaining their

-17-

register with the New Hampshire Public Utilities Commission as required by N.H. Code Admin. R. P.U.C. § 411.02; and (5) improperly switching end users from TWC to itself and/or WorldTel without obtaining Letters of Agency from the end users authorizing the transfers as was required at the time, see Policies and Rules Concerning Unauthorized Changes of Consumers' Long Distance Carriers, 10 F.C.C. Rcd. 9560 (June 14, 1995), and without obtaining permission from the New Hampshire Public Utilities Commission as required by N.H. Code Admin. R. P.U.C. § 411.04. Because ASI violated these regulatory requirements, WorldCom argues, it cannot hold WorldCom to its obligation under the contract and the tariff on which the contract is based. In analyzing this argument, I will assume that ASI violated each of the state and federal regulatory requirements WorldCom cites.

The New Hampshire Supreme Court has rejected the view that a contract is automatically unenforceable simply because a plaintiff has violated state or federal regulatory requirements when fulfilling its obligations under a contract. See DeCato

_____

phone number, see 47 C.F.R. § 52.32. WorldCom alleges that neither ASI nor WorldTel made these filings and paid the required assessments.

-18-

Bros., Inc. v. Westinghouse Credit Corp., 129 N.H. 504, 509-10 (1987). Instead, the court generally follows a totality of the circumstances approach which considers questions such as:

> What was the nature of the subject matter of the contract; what was the extent of the illegal behavior; was that behavior a material or only an incidental part of the performance of the contract . . . what was the strength of the public policy underlying the prohibition; how far would effectuation of the policy be defeated by denial of an added sanction; how serious or deserved would be the forfeiture suffered by the plaintiff, how gross or undeserved the defendant's windfall.

Id. (quoting Town Planning & Eng'g Assocs., Inc. v. Amesbury Specialty Co., Inc., 369 Mass. 737, 745-46 (1976)); see also Finlay Commercial Real Estate, Inc. v. Paino, 133 N.H. 4, 5, 8-10 (1990). But see Kowalski v. Cedars of Portsmouth Condominium Assoc., 146 N.H. 130, 769 A.2d 344, 348 (2001) (recognizing "general rule that contracts with unlicenced brokers are void"); William Coltin & Co. v. Manchester Sav. Bank, 105 N.H. 254, 256-57 (1964)(same).

Applying the New Hampshire Supreme Court's totality of the circumstances test, I conclude that the alleged illegalities

cited by WorldCom do not render its contract with ASI unenforceable. Several factors lead me to this conclusion. First, ASI is seeking to enforce its contract with WorldCom, whereas the alleged illegalities cited by WorldCom concern ASI's relationship with end users. The alleged illegalities WorldCom cites thus are only an incidental part of the contract that ASI is seeking to enforce. Second, the regulatory requirements that ASI allegedly violated are intended to protect end users rather than other carriers such as WorldCom. Thus, enforcement of ASI's contract with WorldCom, a carrier, would not significantly undermine the public policy that underlies the regulatory requirements at issue. Finally, if WorldCom were permitted to retain overpayments that it obtained from ASI in violation of the contract, it would reap an undeserved windfall solely because ASI failed to appropriately arrange for the transfer of end users from TWC to a new reseller after TWC terminated its contract with ASI. Given these circumstances, it would be unreasonable to permit WorldCom to escape its obligations to ASI by pointing to ASI's failure to adhere to state and federal regulatory requirements.

### 2. Sufficiency of ASI's evidence

WorldCom's final argument is that ASI cannot prove that it suffered any damage as a result of WorldCom's excessive billings. First, WorldCom states that if it did overcharge ASI, ASI passed those costs along to its end users and thus did not suffer any compensable injury. Second, WorldCom asserts that the total amount of money that ASI paid to WorldCom throughout their relationship is less than the amount that it should have paid under their agreement, and thus, ASI did not suffer any harm.

While ASI's response to these contentions is less than compelling, it is sufficient to entitle it to a trial on its claims that it overpaid WorldCom by more than $500,000 without obtaining a corresponding recovery of these charges from its end users.

## IV.  CONCLUSION

For the reasons set forth above, I grant WorldCom's Motion for Summary Judgment (doc. no. 54) with respect to ASI's tortious interference (Count I), conversion (Count II), N.H. Rev. Stat. Ann. 358-A (Count III), 47 U.S.C. § 222 (Count VII), and 47

U.S.C. § 258 (Count VIII) claims.  I deny WorldCom's motion with respect to ASI's claims brought under 47 U.S.C. §§ 201, 202 and 203 (Counts IV-VI).

SO ORDERED.


_____
Paul Barbadoro
Chief Judge


March 29, 2002

cc:  Peter Anderson, Esq.
     Michael Bongiorno, Esq.